(No. 65371.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LARRY EYLER, Appellant.

*Opinion filed October 25, 1989.—Rehearing denied January 29, 1990.*

174

· Charles M. Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund, Assistant State's Attorney, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

On August 21, 1984, the dismembered body of Danny Bridges was found in eight garbage bags in a dumpster in Chicago. Following a jury trial in the circuit court of Cook County, the defendant, Larry Eyler, was convicted of murder, kidnapping, aggravated kidnapping, unlawful restraint, and concealment of a homicidal death (Ill. Rev.

Stat. 1983, ch. 38, pars. 9—1(a)(1), 10—1(a)(3), 10—2(a)(3), 10—3(a), 9—3.1(a)).

The State requested a death penalty hearing; defendant waived a jury for that hearing. The trial court, finding no mitigating factors sufficient to preclude imposition of the death penalty, imposed the sentence of death. The court also sentenced defendant to 15 years' imprisonment and 5 years' imprisonment, respectively, on the aggravated kidnapping and concealment of a homicidal death convictions. (The unlawful restraint and kidnapping charges merged with the aggravated kidnapping charge.) This cause is before us on direct appeal. (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603.) Defendant raises numerous challenges to his convictions and death sentence. We affirm.

## I. FACTS

Since defendant challenges the sufficiency of the evidence, we present the evidence adduced at trial in some detail.

At the time of the murder, defendant, age 32, lived at 1628 West Sherwin Avenue in Chicago. He and John Dobrovolskis had been lovers for the three years preceding the murder, although both also dated other men. Defendant engaged in bondage during sexual activities and was the dominant person during such acts. Dobrovolskis occasionally consented to bondage with defendant, because that was what defendant wanted. Defendant lived rent-free in Terre Haute, Indiana, with an older male named David Little for a number of years. In 1981 defendant moved to Chicago; in March 1984 he moved into the apartment building at 1628 West Sherwin, a 42-unit building. Defendant was unemployed; David Little co-signed the lease and paid the rent. Defendant occasionally worked as a house painter.

Robert David Little, age 48 at the time of trial, lived in Terre Haute, Indiana, at all relevant times. After defendant moved to Chicago, Little visited him frequently. He estimated that he visited defendant at the apartment on Sherwin five or six times between March and August 1984; he usually stayed from Friday evening to Sunday evening. Normally, no one else would be present on these weekends.

John Dobrovolskis was defendant's lover. He was married with one child. Dobrovolskis' mother-in-law, Rosemary Kyle, lived with Dobrovolskis' family. Dobrovolskis' wife was aware of her husband's relationship with defendant; she was "tolerant, at best" of this arrangement. Dobrovolskis and defendant had a "very close" relationship, but one which was characterized by frequent arguments. Each became jealous if the other dated other men. David Little's visits to defendant created a problem between defendant and Dobrovolskis. Little and Dobrovolskis were acquainted but did not get along. Dobrovolskis had been told by defendant that when Little was in town, he (Dobrovolskis) could not go to defendant's apartment. He was also instructed not to call, but he did anyway. Dobrovolskis testified that he believed that Little was a homosexual. At the time of trial, Dobrovolskis was 25 years old.

Danny Bridges, the victim, was a 15-year-old prostitute whose customers were men. He worked the streets at Clark Street and Montrose Avenue in Chicago. Joyce Bunch, a friend of the Bridges family, testified that Bridges often stayed at her house and would baby-sit for her. She knew he worked as a prostitute.

The State presented several witnesses, including Dobrovolskis and Little, who testified to defendant's actions and whereabouts from Friday, August 17, 1984, through Tuesday, August 21, 1984. Defendant and the

State agree that the murder occurred during the early morning hours of Monday, August 20, 1984.

Defendant called Dobrovolskis on Friday, August 17, to tell him that Little was coming for the weekend. This meant that defendant and Dobrovolskis had to cancel plans they had to get together. Dobrovolskis told defendant he would then go out with a man named Ray; defendant did not like this and urged Dobrovolskis to stay home.

Little arrived at defendant's apartment between 4 and 4:30 p.m. on Friday. He and defendant spent the evening together. Little slept in the bedroom and defendant slept on the couch.

Dobrovolskis and defendant had numerous telephone conversations throughout the weekend. Defendant told Dobrovolskis that they could get together on Sunday after Little departed. Defendant and Little spent Saturday afternoon and Saturday evening together watching television until 2 a.m. (Sunday, August 19).

On Sunday morning, August 19, the victim was at Joyce Bunch's home. Because his own clothes were dirty, Bunch offered the victim a pair of jeans (size 29/32) and four T-shirts. One shirt was a Duke University T-shirt with cutoff sleeves. When the victim left Bunch's home that day, he asked if he could return to spend the night.

On Sunday evening, defendant and Little went out to dinner. That evening, Dobrovolskis endeavored to call defendant several times but received no answer. Finally, defendant called at 8:45 p.m. and told Dobrovolskis that Little was still there, and defendant did not know how much longer Little planned to stay. According to Dobrovolskis, this was unusual; usually by that time on Sunday, Little had left, and then Dobrovolskis and defendant could be together. Dobrovolskis then told defendant he would go out with Ray again, which he did. This caused defendant to become angry.

Little testified that he left defendant's apartment shortly after 10 p.m. Sunday evening and drove back to Indiana, arriving about 2:30 a.m. Monday, August 20. He went to bed, and got up between 10:00 and 11:00 Monday morning. That day, at about noon, he went to the county courthouse to pay his real estate taxes. Introduced into evidence was the receipt given to Little; the receipt shows that the taxes were paid on August 20, 1984. On cross-examination, the defense brought out that the real estate taxes were not due for another three months.

Sunday evening, Bridges was at his family's home on the north side of Chicago with his sister Sharon Faught. He left the house between 10:30 and 11 p.m. That was the last time Faught saw Bridges alive.

Defendant called Dobrovolskis at 11 p.m. Sunday night and tried to talk Dobrovolskis into staying home that night. Dobrovolskis told defendant he was willing to get together, but defendant said he was still busy with Little. The two argued; Dobrovolskis hung up on defendant twice. Shortly thereafter, Dobrovolskis went out to meet Ray, who was to pick up Dobrovolskis at the corner of Montrose Avenue and Western Avenue between 11:45 p.m. and midnight. As he stood at that corner, Dobrovolskis saw defendant drive south on Western Avenue in his pick-up truck. Dobrovolskis called out defendant's name, but defendant did not stop. Defendant appeared to be alone in the truck.

At some point between 11:45 p.m. and 1 a.m., defendant purchased gasoline at Clark and Ontario Streets on the near north side of Chicago; this was approximately 40 blocks south of the area where the victim normally worked as a prostitute.

Dobrovolskis was out with Ray and a friend until 2:30 or 2:45 a.m. (Monday morning). From the time Dobrovolskis returned home until about 3:30 a.m., Do-

brovolskis and defendant exchanged several telephone calls; they argued. When asked by Dobrovolskis why defendant did not acknowledge Dobrovolskis calling defendant's name on the street, defendant said, "I told you, you and David [Little] are driving me crazy." (Defendant had made the same remark to Dobrovolskis during an earlier telephone conversation.) As he had done all weekend, Dobrovolskis told defendant he wanted to get together with him; defendant said they could not because Little was still there. Dobrovolskis found this to be unusual. Defendant said he had been sleeping, but Dobrovolskis thought he sounded "quiet" and "extremely coherent"; he did not sound as though he had just been awakened.

Defendant refused to go over to Dobrovolskis' apartment. Finally, Dobrovolskis told defendant that if defendant would not come over to his place to spend time with him, Dobrovolskis would go over to defendant's apartment. According to Dobrovolskis, defendant then "yelled, 'No, don't do that.' " Defendant agreed to go to Dobrovolskis' house; he said he would arrive at 4 a.m., and could stay for an hour.

It would normally take defendant 20 minutes to get to Dobrovolskis', but he did not arrive for an hour and a half. The two then had sex on the kitchen floor. Dobrovolskis testified to a number of unusual things about defendant's behavior: defendant appeared to be exhausted; he was not wearing any underwear or socks; his hair was wet; and for the first time in their three-year relationship, defendant was nonresponsive during sex. After they had sex, defendant wanted to stay at Dobrovolskis' for an hour, but Dobrovolskis told him he could not because his mother-in-law would be getting up soon. Defendant left Dobrovolskis at about 5:30 a.m. At 6:15 a.m., defendant called Dobrovolskis and they had a short conversation.

Al Burdicki, the janitor at 1628 West Sherwin, defendant's apartment building, also testified for the State. On the morning of Monday, August 20, 1984, Burdicki observed defendant make 8 to 12 trips down the back stairwell to his (defendant's) storage locker. Burdicki eventually asked defendant what he was doing. Defendant replied that he was getting tools for a job.

Later, at about 3 p.m. on Monday, Burdicki observed defendant, on three separate trips, carry a total of four silver garbage bags and a large "bundle." At this time, Burdicki was with his dog, a German Shepherd. He testified that defendant was carrying the bags like "they were heavy burden [sic]." He explained that the plastic was "stretched real tight" and that defendant's shoulders were stooped over. Each time defendant passed Burdicki and the dog with the bags, the dog growled, barked, and snapped at the bags; the dog "started to go crazy on me," according to Burdicki. On each of the first two trips, defendant was carrying two garbage bags. Burdicki saw him go out of the building with the bags, and return two minutes later without the bags. The dog had no reaction to defendant when he was not carrying the bags. Burdicki reminded defendant not to use other buildings' dumpsters.

On the third trip, defendant carried a heavy package or bundle clenched to his chest, the way someone would carry a heavy bag of groceries. The dog again growled and barked. Shortly thereafter, Burdicki went outside. He observed defendant throw the bundle he had been carrying into the dumpster behind 1640 West Sherwin, the building next to defendant's. It looked as if defendant had just picked up the bundle from the ground. Defendant had to make a 360-degree turn in order to throw the bundle into the dumpster. Defendant then saw Burdicki, and defendant "got this startled look on his face."

Burdicki also testified that during the months of June, July and August 1984 (the three months preceding the murder), he saw young males in their early teens go with defendant to his apartment 10 to 15 times.

Nicholas Fritz, the janitor for the building at 1648-50 West Sherwin, observed a man at about 3:30 p.m. on Monday, August 20, 1984, come out of the 1628 West Sherwin building carrying two heavy bags. He watched as the man walked past the garbage cans for his own building, and threw the bags into the dumpster behind 1640 West Sherwin. Fritz later identified this man as defendant.

At 5 p.m. that day, Monday, August 20, defendant phoned Dobrovolskis, telling him that Little had left and they could get together. That evening, defendant went to Dobrovolskis' home to wait for Dobrovolskis to return from an evening out. Dobrovolskis returned home at 12:30 a.m. on Tuesday, August 21. Defendant was watching television. He was acting "very strangely"; he did not say hello and he was very quiet. The two returned to defendant's apartment. Dobrovolskis noticed that the living room had been straightened up, and that the bathroom was "sparkling clean." This was unusual; Dobrovolskis usually had to straighten up after defendant.

At one point in the evening, Dobrovolskis used a plunger to unclog the kitchen sink. Dobrovolskis described what came up from the sink: "Blood, like white pieces of flesh, and black, gravel type material or charcoal or something like that came up with it, and something pink and swirling that I thought was blood from the chicken fat or something looked like it." Dobrovolskis and defendant went to sleep at 3 a.m. on Tuesday, August 21.

The victim's body was discovered shortly after 6 a.m. on Tuesday. Joe Balla, the janitor at 1640 West Sherwin, arrived at that building at 6 a.m. He saw heavy gray

bags in the dumpster. He was familiar with his tenants' trash, and knew that these bags were not from his tenants. He was angry that others were using his dumpsters; he ripped open one of the bags and saw the upper part of a leg. He called the police, who arrived shortly.

Apparently by the time the police arrived, all three janitors were standing around the dumpster. Fritz told the other two and the police about the man he had seen carrying bags the day before. Burdicki recognized the description as Larry Eyler, the defendant. A short while later, Fritz saw defendant being taken to a police car in handcuffs and he identified defendant as the man he had seen the day before. Later that day, Fritz identified defendant in a lineup.

When Burdicki arrived, he looked into the dumpster; it was the same dumpster he saw defendant throw the package into the day before. He saw five silver bags, the same kind defendant had been carrying. One was ripped and he saw what appeared to be the upper thigh of a human body. He knew "immediately" that these were the bags the defendant had put in the dumpster, and he related this to the police.

Shortly thereafter, defendant and Dobrovolskis were arrested in defendant's apartment. The apartment was locked and placed under guard until officers returned at 1:30 p.m. the same day with a search warrant.

The State presented several expert witnesses and numerous items of physical evidence recovered from defendant's apartment.

Dr. Robert Stein, the chief medical examiner of Cook County, arrived at the scene early Tuesday morning. Under his direction, the garbage bags were removed from the dumpster, opened, and the body parts were reassembled on the ground and photographed. There were eight bags in all, each containing a body part. There was one bag each for the two thighs, two lower legs, two arms,

and head. The torso was in another garbage bag; it was wrapped in an outer layer of clear plastic, and tied with a clothesline. The bags were taken to the crime lab and dried; they were then exposed to "superglue" fumes to enhance any latent fingerprints. Two of defendant's fingerprints were found on one of the bags; one print was inside the bag, and one was outside. (Dr. Stein's testimony concerning the condition of the body is discussed in connection with defendant's challenge to the aggravated kidnapping conviction.)

William O'Connor, a Chicago police officer, processed the crime scene. He testified that when he entered defendant's apartment on Tuesday afternoon, it was clean, and the bedroom smelled of fresh paint. He said that if he had not been looking for evidence of murder, he probably would not have noticed anything amiss. Two of the bedroom walls had been recently painted, up to six or eight inches from the ceiling. Spots of human blood were found on one of these walls.

Extensive testimony was presented concerning what was found in the apartment. At trial, and in this court, defendant conceded that the evidence tends to show that defendant concealed the murder, although at oral argument defendant's counsel stated he was not conceding that his client is guilty of that offense. Defendant does not seriously contend, however, that Danny Bridges was not murdered in defendant's apartment. Therefore, we will only briefly summarize the testimony concerning the evidence recovered from the apartment.

Blood was found all over the apartment. Marian Caporusso, the supervisor of serology for the Chicago police department crime lab, testified without objection as an expert. She used four successive blood tests on various objects: (1) a test to determine whether a stain contains blood; (2) a test to determine if the bloodstain is human blood; (3) typing of human blood using the A-B-O

antigen system; and (4) electrophoretic analysis to identify the enzyme pattern associated with a particular person's blood. (The fourth test is explained more fully below in connection with defendant's challenge to testimony concerning electrophoretic testing.)

Blood with an enzyme pattern matching the victim's was found on numerous objects, including: the bed mattress; the seat of a chair and a sofa in the bedroom; a black belt found in the bedroom; a plastic bag and white sock found in a closet; and various surfaces in the bathroom. A pair of blue jeans (size 32/33) was found, soaked through with what Caporusso called "rivulets of blood" down the front and back; the blood matched the victim's enzyme pattern. Other evidence tended to show that these jeans belonged to defendant. (The State argued that the rivulets of blood resulted from the defendant's carrying the victim's body over his shoulder.)

A bloodstained Duke University T-shirt was recovered from a hamper. Joyce Bunch later identified it as the shirt she had given to the victim. Also recovered from the apartment were a hacksaw frame and a Stanley scratch awl, both of which had traces of human blood. Hacksaw blades were also recovered; apparently, no blood was found on the blades.

After the State rested, the defense presented its case. Two witnesses testified. The first was an investigator with the Cook County public defender's office. He testified that he and one of the defense attorneys visited defendant's apartment on August 24, 1984, for about half an hour. Another witness testified that she was in defendant's presence on Sunday evening, August 19, 1984, between 7:15 and 8:40 p.m. Defendant did not testify.

The State did not present any rebuttal witnesses.

## II. GUILT/INNOCENCE ISSUES
### A. Sufficiency of the Evidence

Defendant's first contention is that the evidence is insufficient to prove him guilty of murder and aggravated kidnapping beyond a reasonable doubt. He contends that it was David Little who brought the victim to the apartment and murdered him.

In his opening brief, defendant contended that the prosecution did not exclude every reasonable hypothesis of innocence—namely, that Little committed the murder. However, we have disapproved of the use of the "reasonable hypothesis of innocence" language in jury instructions, because it is both "obscure and misleading." *People v. Bryant* (1986), 113 Ill. 2d 497, 512.

The principles governing our review of defendant's challenge to the sufficiency of the evidence are well established and were recently set forth in *People v. Phillips* (1989), 127 Ill. 2d 499, 509-10. It is, of course, the jury's function to determine the accused's guilt or innocence and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt. It is not this court's function to retry the defendant. The United States Supreme Court has stated that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; see also *People v. Collins* (1985), 106 Ill. 2d 237, 261.) Moreover, it is for the jury to weigh the credibility of witnesses and to resolve conflicts or inconsistencies in their testimony. (*Phillips*, 127 Ill. 2d at 514.) Applying these principles to the case at

bar, we readily conclude that defendant's convictions are not subject to reversal.

Defendant points to a number of supposed weaknesses in the State's case against him. We will address each of these matters, but the short answer is that these matters were explored on cross-examination and argued to the jury, and the jury found against the defendant.

As we have said, defendant's main contention is that Little is the murderer. He argues that Little's alibi—the payment of his taxes on Monday morning—is simply too convenient, suggesting that the alibi was planned. Moreover, he says, Little could have committed the murder and still have been back in Indiana by about noon, when he paid his taxes.

Little was cross-examined at some length on why he paid his taxes that morning in person. The jury evidently found Little to be credible, and we will not disturb that determination.

Similarly, defendant points to certain minor details in Little's testimony which conflicted with the testimony of other witnesses. For example, Burdicki said he saw Little and defendant having an argument over the weekend, but Little denied having an argument. This and other testimony cited by defendant did not relate to a material issue in the trial; in any event, it is the jury's function, not this court's, to resolve contradictions.

Another conflict in the testimony involved when Little left Chicago. Little testified that he left at approximately 10:15 p.m. Sunday. Dobrovolskis testified that defendant told him that Little was still in the apartment as late as Monday morning at about 6 a.m., after defendant returned from Dobrovolskis' house. (Dobrovolskis testified that at that time, defendant told him on the phone that defendant was able to get into the apartment without waking Little.) This is the only evidence defendant can point to in support of his theory that Little was

in Chicago after 10 p.m. Sunday. Given all of the other evidence, the jury could have concluded that Eyler told Dobrovolskis that Little was still around in order to prevent Dobrovolskis from coming over to defendant's apartment while defendant was in the process of dismembering the victim.

Defendant also points out that there were no fingerprints of the victim in defendant's truck. There was no evidence that defendant cleaned the truck, since defendant's prints and Dobrovolskis' prints were found there. Given the rest of the evidence presented, the absence of the victim's prints does not create a reasonable doubt. Similarly, although none of Little's prints were found in the apartment, there was evidence that defendant's apartment had been thoroughly cleaned, even painted, sometime Sunday night. The jury could have concluded that the absence of Little's prints was explained by the cleaning and painting after Little left.

Defendant also contends that the evidence that defendant placed the body parts in the dumpster does not prove he is guilty of murder. We would agree with that statement, but the fact is that the State presented abundant evidence in addition to the evidence that defendant attempted to conceal the murder. Therefore, we find it unnecessary to address this argument further.

The trial court in this case, when it sentenced defendant to death, stated that the evidence of defendant's guilt of all the offenses charged was overwhelming. Among the more probative of the record evidence is the following: testimony that, in recent months, defendant was seen at his apartment with young males 10 to 15 times; the physical evidence, particularly the awl and hacksaw, and the pair of jeans, which the jury could have concluded belonged to defendant, soaked through with the victim's blood; defendant's uncharacteristic behavior following the murder; the evidence, including the

testimony of the janitors and the fingerprints on the garbage bags, that defendant dumped the body parts into the dumpster; Little's testimony that he left Chicago about 10:15 p.m. on Sunday, corroborated by other testimony that Little usually, if not always, left on Sunday evening; and testimony which established that defendant had plenty of time from Sunday evening through Monday afternoon (when he was seen with the garbage bags) to accomplish the aggravated kidnapping, murder and dismemberment. Viewing this and the remainder of the evidence in the light most favorable to the prosecution, we hold that a rational fact finder could reasonably have found that defendant committed the aggravated kidnapping and murder of the victim. See *Jackson v. Virginia*, 443 U.S. at 326, 61 L. Ed. 2d at 578, 99 S. Ct. at 2793.

## B. Aggravated Kidnapping Conviction

Defendant's second contention is that the State failed to prove the elements of the crime of aggravated kidnapping. (Ill. Rev. Stat. 1983, ch. 38, par. 10—2.) Defendant's conviction for aggravated kidnapping made him eligible for the death penalty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)(c)). That conviction is the sole statutory aggravating factor supporting the sentence of death.

The statute under which defendant was charged provides as follows:

"(a) Kidnaping occurs when a person knowingly:

\* \* \*

(3) By deceit or enticement induces another to go from one place to another with intent secretly to confine him against his will." (Ill. Rev. Stat. 1983, ch. 38, par. 10—1(a)(3).)

A person commits aggravated kidnapping when he inflicts great bodily harm or commits another felony upon the kidnapped victim. Ill. Rev. Stat. 1983, ch. 38, par. 10—2(a)(3).

The State's position is that the evidence supports the conclusion that defendant deceived or enticed the victim to accompany defendant to his apartment by falsely representing that defendant would pay the victim money in exchange for sexual services, and that, once they were in the apartment, defendant secretly confined the victim, bound and tortured him, and ultimately stabbed him to death.

Defendant raises numerous alternative arguments. He argues that any confinement was incidental to the murder rather than an independent crime. He also argues that the State "has not rebutted" the possibility that Bridges consented to be bound and tortured, or the possibility that the ligature marks and puncture wounds on his body might have been inflicted by some other customer of the victim. Finally, he contends that even if the wounds were inflicted by the murderer against the victim's will, the wounds were "simply a part of the murder." (In his reply brief, defendant abandoned his argument that the evidence is insufficient because the victim, a male prostitute, almost certainly went to defendant's apartment voluntarily. As the State correctly pointed out in its brief, under the "deceit and enticement" provision of the kidnapping statute, the victim by definition will voluntarily accompany the kidnapper.)

In order to prove the defendant guilty of kidnapping under the relevant portion of the statute, the State must prove that the defendant knowingly (1) induced the victim to go from one place to another (2) by deceit or enticement (3) with the intent secretly to confine the victim (4) against the victim's will.

Defendant does not challenge elements one and two—the inducement by deceit or enticement. He also does not contend that the confinement, if any, was not secret. He argues that the evidence does not show that the vic-

tim was confined by defendant against the victim's will. We disagree.

The record reveals the following. Dr. Robert Stein, chief medical examiner of Cook County, examined the victim's body at the scene where the body parts were found, and later performed an autopsy. He testified that there were 14 puncture wounds to the front of the victim's chest, which were made before the victim died. These wounds were small and appeared to be something that could be produced with "an ice-pick-like or an awl-like instrument." These wounds were not very deep; they went through the skin and some of the underlying fat and muscle. On both wrists there were round abrasions which were compatible with a ligature. The victim's right eye was black and blue; this injury was of recent origin. There was also a small abrasion on the left side of the face. There were five stab wounds in the front of the victim's body, and three stab wounds to the back. The cause of death, as stated on the death certificate, was the stab wounds to the back. Cocaine and alcohol were found in the victim's bloodstream.

The police provided Dr. Stein with a hacksaw blade which was recovered from defendant's apartment. Dr. Stein used that blade to make a cut through the bone of the victim's body; this cut was compatible with the cuts made by the dismemberment of the body. The police also provided Dr. Stein with the awl recovered from defendant's apartment; Dr. Stein testified that in his opinion, the awl could have caused the 14 puncture wounds. Finally, Dr. Stein was given the piece of rope or clothesline that was wrapped around the package containing the torso. He testified that the diameter of that rope matched the size of the "patterned-like abrasion" found on the victim's wrists.

The jury viewed photographs of the body parts, including photographs of the victim's chest and wrists.

The State and the defendant appear to agree that the confinement, if any, in this case is shown by the binding of the victim's wrists. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 196 (evidence that victim's hands were bound, plus evidence that victim's blood was found in several rooms and on the telephone, was sufficient to prove victim was restrained by defendant; aggravated kidnapping conviction affirmed).) Defendant acknowledges that in the typical homicide case, if the victim's body shows signs of bondage, it can be inferred that the binding occurred at the time of the murder. He contends, however, that such an assumption cannot be made in the case at bar because the victim here was a prostitute.

The defendant argues, first, that the jury could have concluded that the ligature marks on the victim's wrists were inflicted by someone other than the murderer—*i.e.*, by another customer of the victim. In support, he points out that there was testimony that bondage and promiscuity are not uncommon in the homosexual community, and that there was no testimony stating that the ligature marks were inflicted contemporaneously with the murder.

The answer to defendant's contention is that the jury *could* have reached a different conclusion, but it did not, and the evidence fully supports the conclusion it did reach. It was certainly within the province of the jury to decide, based on the testimony of Dr. Stein and the photographs it viewed, whether the ligature marks were fresh. The State points out, and defendant does not dispute, that the photographs do not show any scarring or healed rope marks; this fact tends to negate the inference that the victim engaged in bondage of the type evidenced here on other occasions. The photographs show, and the defendant does not dispute, that the puncture wounds are all symmetrical, straight punctures, not an-

gled, and there are no tears or horizontal wounds. This evidence supports the inference that the victim was bound so tightly that he was unable to attempt to avoid the punctures. In other words, the jury could reason that had the victim engaged in this sort of bondage before, there would probably be evidence of scarring or healed rope marks. In the absence of such evidence, the jury could conclude that the ligature marks were inflicted by the murderer. In sum, a rational jury could conclude from the evidence that defendant confined the victim and, from this, the jury could infer that defendant possessed the requisite intent to secretly confine the victim.

Defendant next theorizes that even assuming the victim was confined by the murderer, the jury could conclude that the victim, a prostitute, consented to the bondage and to the infliction of the puncture wounds. Again, the jury could have so concluded, but it did not. As we have explained, the evidence supports the inference that the victim had no history of the sort of bondage or sadistic sex inflicted upon him. Given this, the jury could conclude, contrary to defendant's suggestion, that it was very unlikely that this 15-year-old would, for the first time, consent to such activities on this occasion. The evidence supports a finding that the victim was confined against his will.

Defendant also argues that, even assuming confinement without consent, the puncture wounds were simply a part of the murder. We recently rejected a similar contention in *People v. Phillips* (1989), 127 Ill. 2d 499. The defendant in *Phillips*, like the defendant in the case at bar, was convicted of murder and aggravated kidnapping and sentenced to death. The aggravated kidnapping charge was based on the infliction of great bodily harm on the victim. (Ill. Rev. Stat. 1981, ch. 38, par. 10—2(a)(3).) The defendant in *Phillips* argued that his sentence must be reversed because the acts which formed

the basis for the murder charge were the very same acts which already had enhanced the crime of kidnapping to aggravated kidnapping. 127 Ill. 2d at 538.

We rejected this contention because there was sufficient evidence to support a finding of aggravated kidnapping independent of the evidence supporting the murder conviction. The cause of death was strangulation; a secondary cause was loss of blood resulting from blows to the head. The evidence showed the victim suffered additional injuries, such as contusions and abrasions on her face and body, which supported the aggravated kidnapping conviction without reference to the injuries which caused her death. (127 Ill. 2d at 539-40.) Similarly, in the case at bar, the cause of death was the stab wounds to the back. In addition, there was evidence of other injuries: the 14 puncture wounds, the blow to the right eye, and the abrasion on the left side of the face. The infliction of these injuries was not, as the defendant phrases it, "simply part of the murder." The evidence supports defendant's conviction for aggravated kidnapping quite apart from the murder conviction.

Finally, defendant contends that under the *Levy-Lombardi* doctrine, his conviction for aggravated kidnapping cannot stand. (*People v. Levy* (1965), 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793; *People v. Lombardi* (1967), 20 N.Y.2d 266, 229 N.E.2d 206, 282 N.Y.S.2d 519.) Generally speaking, the *Levy-Lombardi* doctrine states that a defendant cannot be convicted of kidnapping where the asportation or confinement of the victim was merely incidental to another crime, such as robbery, rape or murder. (In this case, the only question is whether the confinement was incidental; the asportation aspect is not relevant, since it is agreed that the victim voluntarily went to defendant's apartment.)

In *People v. Enoch* (1988), 122 Ill. 2d 176, we briefly addressed the *Levy-Lombardi* doctrine. We agreed that

"an aggravated kidnapping conviction should not be sustained where the asportation or confinement may constitute only a technical compliance with the statutory definition but is, in reality, incidental to another offense." (122 Ill. 2d at 197.) However, we ruled that *Enoch* was not such a case; the evidence showed that there was more than a simple detention incidental to the murder or rape. While the defendant and the victim were inside the victim's apartment where she was murdered, the victim's boyfriend attempted for 45 minutes to contact her by calling her apartment and ringing the doorbell. When the victim was found, her hands were bound behind her back with wire. There was a laceration across her throat, numerous stab wounds in her chest, and a cut from her sternum to her pubic bone. Blood was found in several rooms and on the telephone, indicating an attempt to escape. In these circumstances, we found that there was a secret confinement which constituted kidnapping. 122 Ill. 2d at 197.

Similarly, the confinement which occurred in the case at bar was not "incidental to" the murder. The evidence supports the inference that when defendant induced the victim to go to defendant's apartment for the supposed purpose of prostitution, defendant had something else in mind: to bind (and most likely gag), torture, and stab his victim before murdering him, in a place where the victim was beyond the reach of anyone who could help him. The confinement necessary to accomplish this cannot be said to be incidental to the crime of murder. (*Cf. People v. Levy* (1965), 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793 (no kidnapping where defendants, at gunpoint, accosted the victims seated in their car, took control of the car, robbed the victims during a 27-block ride that lasted 20 minutes, stopped the car and fled).) For these reasons, the *Levy-Lombardi* doctrine is inapplicable to this case.

In sum, a rational jury could find that the State proved all the elements of the offense of aggravated kidnapping.

## C. Motion to Suppress Evidence

Defendant's third contention is that the trial court erred in denying his motion to suppress evidence seized from his apartment. More specifically, he contends that the affidavit supporting the complaint for search warrant contained false statements and omissions, and that he was entitled to a hearing in order to challenge the veracity of the affidavit.

The United States Supreme Court in *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, recognized a limited right to challenge the affidavit supporting a search warrant. The Court explained that there is a presumption of validity with respect to the affidavit. In order to obtain an evidentiary hearing, the defendant must make a substantial preliminary showing that false statements in the affidavit were made knowingly and intentionally, or with reckless disregard for the truth, and that those false statements are necessary to establish probable cause. A defendant must then prove "the allegation of perjury or reckless disregard" by a preponderance of the evidence. (438 U.S. at 156, 57 L. Ed. 2d at 672, 98 S. Ct. at 2676.) If the affidavit is insufficient to establish probable cause without the false material, the search warrant must be voided and the fruits of the search excluded. This court has held that a defendant may also allege and prove that the police officer intentionally omitted information from the affidavit. *People v. Stewart* (1984), 105 Ill. 2d 22.

Prior to trial, defendant moved to quash the search warrant and suppress the evidence seized. The State and the defendant agreed that at the hearing on the motion to quash held February 27, 1985, defendant would be al-

lowed to present testimony and other evidence concerning his allegations of false statements and omissions. If he made the requisite preliminary showing under *Franks*, this evidence would be considered by the court; if defendant failed to make the preliminary showing, the evidence would be stricken.

At the conclusion of the hearing on the motion to quash, the court ruled that defendant had failed to make a threshold showing under *Franks* that the affidavit contained intentional misstatements or omissions. Accordingly, the court ruled that defendant was not entitled to a *Franks* hearing. The evidence offered was permitted to stand as an offer of proof for purposes of appeal.

Detective Stone of the Chicago police department executed the complaint for search warrant. Detective Stone's affidavit supporting the complaint contained the following statements. (1) Joe Balla of 6525 North Kimball told Stone he had discovered a human body part in a plastic bag in a dumpster. (2) Allen Burdicki, the janitor at 1628 West Sherwin, told Stone that at about 3:30 p.m. on August 20, 1984, he observed Eyler on two occasions carrying large silver garbage bags from the building; he also observed him returning to the building without the garbage bags. Finally, Burdicki observed Eyler carrying a large object in front of him and observed him dumping this object into the dumpster from which the body parts were later recovered. (3) Nick Fritz of 1225 West Chase related that between 3:30 and 4 p.m. on August 20, he observed a man take two garbage bags out of 1628 West Sherwin and dump them into the dumpster where the body parts were later discovered. (4) Stone possessed knowledge that (a) Eyler had been indicted for a murder in Lake County, Illinois, and the victim of the murder had a last known address near the location of "this incident"—*i.e.*, Eyler's apartment; (b) Eyler's truck had been used to transport the victim of that murder from

Chicago to Lake County; and (c) the Lake County murder case is now in the appellate court on a motion to suppress "that evidence."

The premises to be searched were Eyler's apartment at 1628 West Sherwin. The affidavit states that Stone obtained the information set forth on August 21, 1984.

To make the preliminary showing under *Franks*, defendant pointed to the following alleged omissions and misrepresentations in the affidavit, before any testimony was heard. (1) The affidavit did not state that there was a 15-hour time lapse between the time defendant was seen dumping garbage bags into the dumpster and the time the body part was discovered. (2) The Lake County prosecution was irrelevant because defendant had not been convicted. (3) The statement that the Lake County murder victim lived near this incident was intended to mislead since (a) at the time of the Lake County murder, defendant did not live in the 1628 West Sherwin building and (b) the distance between the location of this incident and the Lake County victim's address was 25 blocks. (4) Contrary to the statement in the affidavit, the evidence in the Lake County case was inconclusive as to whether defendant's truck had been used in that murder.

We conclude that the trial court did not err in denying defendant's motion for a *Franks* hearing and in denying his motion to suppress evidence.

Defendant principally challenges the statements in the affidavit concerning the Lake County murder. Two of those statements are true: that defendant was indicted for that murder, and that the case was in the appellate court on a motion to suppress evidence. The affidavit does not state or imply that defendant was convicted. As the State points out, a judge issued the warrant, not a layman untrained in the law who might equate "indicted" with a finding of guilty. The other statements later proved to be inaccurate. However, we

agree with the trial court that defendant made no showing that these statements were deliberate falsehoods.

We need not address the statements and alleged omissions concerning the Lake County murder in any more detail. *Franks* held that no hearing is required if, after the alleged untruths are removed from the affidavit, the remainder is sufficient to establish probable cause. (Accord *People v. Lucente* (1987), 116 Ill. 2d 133, 145-46 (holding that Illinois law follows *Franks*, and disapproving of *People v. Garcia* (1982), 109 Ill. App. 3d 142, which held that if an affidavit contains *any* false statements, the warrant must be quashed, even if the remainder establishes probable cause).) The information obtained from the three janitors, which we have set out above, is sufficient to establish probable cause to search defendant's apartment. Therefore, even absent the statements concerning the Lake County murder, the warrant is supported by probable cause and no hearing was required. Similarly, since the affidavit is sufficient without the Lake County statements, we need not address defendant's argument that evidence that has been suppressed in another case (the Lake County murder) cannot be used to establish probable cause.

Finally, defendant complains of the omission of the information that there was a 15-hour time lapse between the time defendant was seen dumping the bags, and the discovery of the bags. Defendant was seen with the bags at 3:30 p.m. on Monday, and the body part was discovered at 6 a.m. Tuesday. The gist of his argument is that any number of people could have placed the bags containing the body parts in the dumpster during that time. The trial court ruled that this omission was not important because the 15-hour time period included a nighttime, which is a time when people usually sleep and do not place garbage in dumpsters. We agree. It must be remembered that probable cause is a matter of probabili-

ties, and that courts are to interpret affidavits in a commonsense manner. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Because the 15-hour time lapse was not material to the determination of probable cause, its omission did not entitle defendant to a *Franks* hearing. *People v. Stewart* (1984), 105 Ill. 2d 22, 43-44.

In sum, we hold that defendant did not make the substantial preliminary showing required by *Franks*, and that the search warrant was supported by probable cause. Accordingly, the trial court's rulings denying defendant's motion for a *Franks* hearing and motion to quash the search warrant and suppress evidence were not erroneous.

### D. Remarks by the Trial Judge

Defendant's fourth contention is that certain remarks made by the trial judge to the prospective jurors deprived defendant of his right to an impartial jury. According to defendant, the remarks indicated the judge's belief that defendant was guilty and dangerous.

First, in his initial remarks to the prospective jurors, the trial judge stated:

> "First of all, you heard what the charges are on this case and those charges include the offense of murder. If you are selected as jurors on this case, I can assure you that you will not be asked to decide the issue of whether capital punishment or the death sentence will be imposed. That is not an issue that you will be asked to decide in this case."

Read literally, this passage might be taken to assume that the defendant will be found guilty. However, this isolated passage must be read in the context of the entire trial, which lasted approximately 10 days and spans over 2,400 pages of transcript. With the exception of one other instance, which we address below, defendant

can point to no other statement by the court to support his contention.

Contrary to defendant's contention, the record affirmatively shows that the judge scrupulously protected defendant's right to an impartial jury and repeatedly emphasized the presumption of innocence. Just after the judge made the remarks complained of, the court explained to the jury that the defendant is presumed innocent, that the State has the burden of proving him guilty beyond a reasonable doubt, that the defendant does not have to testify, nor does he have to prove anything. In addition, the judge told each prospective juror that the case must be decided solely on the evidence presented at trial, and he cautioned the jury to keep an open mind each time the jury was dismissed. The judge even made sure throughout the trial that the jurors were unaware that defendant was in custody, despite the fact that defendant's counsel commented to the judge that this was not really necessary.

Viewing the record as a whole, we are convinced that the mere absence in the quoted passage of the words "if the defendant is found guilty" could not have prejudiced the jury.

The second instance defendant points to occurred when a prospective juror asked whether the defendant sees the jury cards. The judge responded that the attorneys should make sure the defendant does not see the jurors' names and addresses. The judge also stated that the defendant "does not and certainly should not" see the names and addresses.

The State correctly points out that any error in this regard is waived because defendant did not make a contemporaneous objection, nor did he raise it in his posttrial motion. (*People v. Enoch* (1988), 121 Ill. 2d 176.) The plain error exception to the waiver rule (107 Ill. 2d R. 615(a)) is inapplicable. We do not find that the evi-

dence was closely balanced. Nor do we find that the judge's remarks concerning the jury cards, assuming they were improper, constituted an error of such magnitude that they denied defendant a fair and impartial trial. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; see also *People v. Richardson* (1988), 123 Ill. 2d 322, 359-61.) To the contrary, for the reasons we have stated, the record reflects that defendant received a fair trial from an impartial jury.

## E. Supergluing Technique

Defendant next contends that the trial court erred in admitting into evidence two of his fingerprints because the scientific technique used to develop those prints, known as supergluing, was not shown to be generally accepted in the scientific community.

Two fingerprints, identified as defendant's, were found on one of the garbage bags containing a body part of the victim. One print was inside the bag, and one outside. These two latent prints were developed by exposing the bags to cyanoacrylate ester (commonly known as "superglue") fumes. In addition to the two prints on the bags, 47 of the 51 prints identified as defendant's that were found in his apartment and truck were developed through supergluing. Defendant does not challenge the admission of those 47 prints.

Officer James Doran testified before the jury concerning the supergluing process. He had been with the Chicago police department for 14 years. In August 1984, he was a supervisor of the latent fingerprint development unit of the Chicago police department crime lab. His unit was responsible for developing or enhancing ridge impressions found on evidence submitted to the unit. He worked on approximately 3,000 cases in a three-year time period. He received a bachelor of science degree in biochemistry, and a master of science degree in social

justice. He had taken courses at the FBI Academy in latent fingerprints and in laser technology, and at Northwestern University in immunology, serology and industrial microbiology. He testified without objection as an expert in the field of fingerprint development.

Doran testified that latent print examiners use a variety of means to develop prints, including laser, powders, dyes, chemicals such as ninhydrin, iodine, and silver nitrate, and cyanoacrylate ester, or superglue. (According to Doran, this is the same superglue that can be purchased at the store.) He testified that he had used all of these methods over a period of many years.

He testified that superglue was developed as an adhesive in the early 1950s by Eastman Kodak. In the early 1970s, a man named Candell, working with Army Intelligence and the Metropolitan Tokyo police, found that if he put an object in a tank with superglue and left it there for several days, ridge impressions would form. In about 1978, Candell wrote about the technique in the Identification News. The FBI and several other agencies picked up on it, and the Chicago crime lab began using it.

In order to determine whether an object contains latent fingerprints, it is first exposed to laser. If no ridge impressions are visible, the examiner will proceed to another type of enhancer or developer, such as superglue. When supergluing is used, the object is placed in a chamber that can be sealed off, and the superglue is spread on the bottom of the chamber. Heat can be added to the chamber to accelerate the fuming process; the process then takes approximately 20 minutes. In addition, an entire area can be exposed to the fumes. In the case at bar, defendant's truck and apartment were subjected to the supergluing process.

After the fuming process, latent prints may become visible. At that point, the object may again be subjected

to laser. The goal is to make the print visible so that it can be photographed.

Concerning how the process works, Doran testified that it is "suspect[ed] that it works on the moisture"—that is, the moisture that is secreted from one's fingertips. The superglue process is "reliant upon the use of the reagent cyanoacrylate."

Doran then testified at length concerning his examination for fingerprints of numerous objects from defendant's apartment, the garbage bags, and defendant's truck and apartment.

On cross-examination, Doran testified that if too much superglue is used, part or all of the print can be destroyed. Doran agreed that "hypothetically," if the latent print had been obliterated or in some way destroyed, then there could be a false identification or a misidentification. He believed that Loktite Corporation had done some studies on the effect of the reagent cyanoacrylate, although he was not aware of those studies. He was aware of "controlled studies on various objects," although he was not asked to identify those studies. He was not aware of any controlled studies on deterioration of prints caused by supergluing.

Officer Theatrice Patterson was examined on *voir dire*. He is a Chicago police officer assigned to the identification section of the Chicago police department as a latent print examiner. He testified without objection as an expert on latent print examination and comparison.

Patterson's job is to identify unknown latent prints taken from a crime scene or objects by comparing known prints with the latent, unknown prints. He does not examine the crime scene, lift prints, or enhance prints for comparison. He is provided with photographs of latent prints, which he then compares to the inked, or known, prints.

Under questioning by defendant's counsel, Patterson did not agree that if part of a latent print had been destroyed, this could result in a false reading when he made his comparison. He stated that if there is one "unexplainable dissimilarity" between the known and the unknown print, it would "void the identification." As an example of a dissimilarity that can be explained, he said that with powder, if the powder does not adhere to the full ridge, it will leave a vacant area, and the ridge will then appear as two ending ridges.

Upon examination by the State, Patterson testified that fingerprints developed by supergluing account for approximately 25% of the identification section's case load. The process has been used by the Chicago police department since 1980 or 1981. He considers the process to be reliable, and, to his knowledge, his colleagues in his field of expertise consider it reliable. It is particularly effective on plastic, vinyl, and cellophane. It is used in a number of other jurisdictions besides Illinois and in other countries, and it is used by the FBI.

Patterson was not aware of any controlled studies concerning the use of superglue. He has read articles about the process, but these articles did not address the accuracy of the process.

The defendant did not present any expert witnesses.

After Doran's testimony, and again after Patterson's testimony, the court denied defendant's motion to exclude testimony concerning supergluing of prints. The court ruled that the use of superglue to enhance prints is generally accepted in the scientific community. It stated that any defects in the process had been brought out by defense counsel, and that it is for the jury to decide whether the prints were obliterated in part or in full. After Patterson's testimony, the court reiterated its view that the question of the accuracy of the process is a

question that is properly presented to the jury for its determination.

Defendant first argues that the supergluing technique does not meet the test set forth in *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013. We have accepted the *Frye* standard for evaluating the admissibility of new scientific techniques. The court in *Frye* stated:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014, quoted with approval in *People v. Baynes* (1981), 88 Ill. 2d 225, 241.

See also *People v. Partee* (1987), 157 Ill. App. 3d 231, 260.

(We reject the State's argument, unsupported by any citations to authority, that the *Frye* test does not apply to this particular technique.)

Defendant makes two related arguments concerning the technique's reliability. He contends that since supergluing can cause deterioration of ridge impressions, misidentifications may result. He also contends that supergluing may have obliterated all of Little's prints; this possibility, he says, shows that the technique is unreliable. Finally, he argues that the trial court improperly took judicial notice of the reliability of the technique.

Neither party addressed the appropriate standard of review. The determination whether to admit expert testimony is committed to the discretion of the trial court (*People v. Mack* (1989), 128 Ill. 2d 231, 250), and we believe the same principle applies to expert testimony con-

cerning a new scientific technique. (Accord *United States v. Downing* (3d Cir. 1985), 753 F.2d 1224, 1240.) Accordingly, we review the trial court's decision to admit expert testimony concerning the supergluing process to determine whether the trial court abused its discretion.

We conclude that the trial court did not abuse its discretion. The testimony of the two State witnesses established the following: the technique is routinely used by the Chicago police department, along with a variety of other techniques; the Department has used it since 1980 or 1981; those working in the field of print examination and comparison consider it reliable; and the process is used by other jurisdictions in this country, by other countries, and by the FBI. We think this is sufficient to establish that the technique is generally accepted by the relevant scientific community, which in this case is the field of latent print development and comparison.

We agree with the trial court's ruling that the other matters complained of affect the weight, not the admissibility, of the evidence. For example, the testimony established that experts in the field consider the technique reliable, despite the fact that, apparently, it is not fully understood how the process works. This latter consideration, then, affects only the weight of the evidence, and may be brought out on cross-examination and argued to the jury.

Defendant argues that because supergluing may obliterate prints, misidentifications are possible. Officer Doran testified that misidentifications could occur; Officer Patterson testified, in essence, that this could not occur. However, Patterson is an expert in print comparison and identification, and Doran is not. Moreover, the State in its brief correctly states what defendant is really arguing concerning obliteration of prints: that fingerprints left by some unknown person will haphazardly degrade through supergluing in such a manner that the remain-

ing ridge impressions just happen to match those of defendant. We think it was for the jury to determine the likelihood that this occurred.

Defendant's theory that the superglue obliterated all of Little's prints in the apartment again goes to weight, not admissibility. There was evidence that defendant thoroughly cleaned the apartment and painted part of the bedroom after Little left. Moreover, both defendant's and Dobrovolskis' prints were found in various places in the apartment. The jury could have concluded that it would be highly unlikely that the superglue fumes obliterated all of Little's prints, but not those of defendant or of Dobrovolskis.

Finally, defendant's contention that the trial court improperly took judicial notice of the reliability of the technique merits little discussion. We agree with defendant that in the circumstances of this case, where the admission of testimony on the technique presented an issue of first impression, the technique's reliability is not a proper subject of judicial notice. (See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence §§201, 202 (4th ed. 1984).) This does not affect our disposition of the issue. The trial court also expressly based its ruling on the testimony given and, in any event, it is well settled that we may affirm a ruling on grounds different from those stated by a lower court.

For these reasons, we hold that the trial court did not abuse its discretion in admitting expert testimony concerning the supergluing process. Accordingly, the trial court properly admitted the two fingerprints identified as defendant's that were developed using the supergluing process.

### F. Electrophoresis

Defendant's sixth contention is that the trial court erred in admitting testimony on electrophoretic testing

of dried blood because the prosecution failed to establish by impartial expert testimony that such testing is reliable and generally accepted in the scientific community.

A recent opinion of our appellate court explained the technique as follows:

> "Electrophoresis 'involves the application of an electrical current to a blood sample for a period of time, thereby causing the different enzymes present in the blood to separate into their protein components. After separation, the enzymes and their protein components can be identified and, in this way, the blood can be classified more specifically than is possible by traditional A, B, O blood grouping.' (*Robinson v. State* (1981), 47 Md. App. 558, 574, 425 A.2d 211, 220.) Electrophoresis has long been recognized as a reliable method of studying genetically determined differences between individuals ***. Thus, the methodology and genetic mark typing poses no issue of reliability or acceptance amongst the scientific community. Rather, the sole dispute centers on the use of electrophoresis by forensic scientists in examining genetic markers from dry stain analysis and the effect of environmental factors on typing results. Juricek, *Misapplication of Genetic Analysis in Forensic Science*, 29 J. Forensic Sci. 8 (1984)." *People v. Partee* (1987), 157 Ill. App. 3d 231, 260-61.

In the case at bar, dried blood was found on numerous surfaces and objects in defendant's apartment: on the bathroom floor and in the drain, under the bathroom door, on the bedroom wall, on a couch and chair in the bedroom, in the kitchen sink drain, and on goggles, an awl, a hacksaw, and clothing. As we have explained, four successive tests were performed on the stains thought to be blood. Most bloodstains could be identified as human blood, and those that could be typed on the A-B-O system were of the victim's blood type, A. Defendant has type O blood.

In addition, bloodstains on the bathroom floor, on several pieces of bedroom furniture, and on clothing found

in a closet, including blue jeans and a sock, were also typed using electrophoresis. Marian Caporusso, supervisor of the serology section of the Chicago police department crime lab, testified that all the bloodstains that could be typed using electrophoresis showed a pattern of enzymes that matched that of the blood in the victim's body.

The issue of the admissibility of expert testimony on electrophoretic testing of dried blood was thoroughly addressed in *Partee*, 157 Ill. App. 3d at 260-63. We agree with the reasoning and conclusion of the court in *Partee*, and hold that electrophoresis is generally accepted by forensic scientists as a reliable method of detecting genetic markers in blood and is therefore admissible. Accord *People v. Redman* (1985), 135 Ill. App. 3d 534; *People v. Reilly* (1987), 196 Cal. App. 3d 1127, 242 Cal. Rptr. 496; *State v. Washington* (1981), 229 Kan. 47, 622 P.2d 986; *Robinson v. State* (1981), 47 Md. App. 558, 425 A.2d 211; *contra People v. Young* (1986), 425 Mich. 470, 391 N.W.2d 270. See also Annot., *Admissibility, in Criminal Cases, of Evidence of Electrophoresis of Dried Evidentiary Bloodstains*, 66 A.L.R.4th 588 (1988) (of the decisions analyzed, courts from 10 jurisdictions have held the testimony to be admissible; only one jurisdiction, Michigan, has held to the contrary).

Defendant's principal argument concerning electrophoresis is that the trial court, as well as the Illinois appellate court decisions that have accepted the technique, erred in failing to require the prosecution to show through impartial expert testimony that the technique is reliable and generally accepted in the scientific community. (See *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, 1014.) Defendant cites to no Illinois decisions in support of his argument that only testimony from impartial (that is, non-law-enforcement) experts will suffice to establish a technique's reliability. The Michigan Supreme

Court has accepted the position advanced by defendant (*Young*, 425 Mich. 470, 391 N.W.2d 270) but we find it unpersuasive.

Instead, we agree with the implicit conclusion of the court in *Partee* that the relevant scientific community is forensic science and that testimony from experts within that community is sufficient to discharge the prosecution's burden. (Accord *Robinson*, 47 Md. App. 558, 425 A.2d 211.) Finally, we note that in an exhaustive opinion on the issue, a California appellate court, in concluding that the challenged technique is generally accepted in the scientific community, observed that Dr. Grunbaum (whose writings the defendant in the case at bar relies upon) "stands virtually alone in his opposition to electrophoretic typing of dried bloodstain evidence." *Reilly*, 196 Cal. App. 3d at 1148, 242 Cal. Rptr. at 509.

We join the overwhelming majority of jurisdictions that have addressed the issue in holding that expert testimony on electrophoretic testing of dried bloodstains is admissible. Accordingly, the trial court did not err in admitting such testimony.

### G. "Street Kids" Testimony

Defendant next argues that testimony that defendant brought young males to his apartment was irrelevant and that, even if it were relevant, its prejudicial effect outweighed its probative value.

On direct examination, Burdicki, the janitor at defendant's apartment building, was asked whether he ever saw anyone with the defendant or going to the defendant's apartment, other than Little and Dobrovolskis. Burdicki responded that during June, July and August 1984 (the three months preceding the murder), he saw defendant with young males in their early teens from 10 to 15 times. He also stated that he had never seen either Dobrovolskis or Little with young

teens. Burdicki was then asked to describe these young males; it was at this point that defendant asked for a sidebar. Defendant objected on relevancy grounds. The assistant State's Attorney explained his theory of relevancy: "Judge, I think who is going in and out of the defendant's apartment is about the most relevant thing that there is at this trial right now."

Defendant's objection was overruled, and Burdicki answered the pending question by describing the young males as "street kids." He explained that he used that term because the kids were dirty and unkempt; the kids looked like they lived on the street. He also testified that when Little was in Chicago visiting defendant, Burdicki never saw any young males in the building. The parties refer to this testimony as the "street kids" evidence.

Defendant cannot seriously argue that this testimony is irrelevant. Relevant evidence is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. (*People v. Monroe* (1977), 66 Ill. 2d 317, 322.) At trial, the State succinctly explained the testimony's relevance in the quoted passage. Defendant's theory throughout the trial and before this court is that he was not the one who brought Danny Bridges to his apartment; he argues repeatedly that there is "no evidence" linking him to Bridges. The State was entitled to introduce evidence tending to show that it was more likely than not that it was defendant who brought 15-year-old Bridges, a prostitute who worked the streets, to defendant's apartment. Not only was the evidence relevant, it was highly probative, particularly considering the proximity in time to the murder and the number of times Burdicki saw the defendant with young males.

Defendant's prejudice argument fares no better. He argues that the probative value, if any, of the "street

kids" testimony was outweighed by its prejudicial effect of showing that defendant was sexually promiscuous with young men.

In the trial court's discretion, relevant evidence may be excluded if its prejudicial effect substantially outweighs its probative value. (*People v. Baynes* (1981), 88 Ill. 2d 225, 244; *People v. Kolep* (1963), 29 Ill. 2d 116, 124.) In this context, prejudice means "an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1 (4th ed. 1984); see, *e.g.*, *People v. Lampkin* (1983), 98 Ill. 2d 418, 428-29 (defendant's alleged threat made six years prior to the occurrence was very likely to arouse the jury's prejudice or hostility; prejudicial effect outweighed any probative value).

In the case at bar, the evidence was highly probative on a crucial disputed fact: who brought the victim to defendant's apartment. For this reason, we doubt that any degree of prejudice would justify excluding the evidence in this particular case. In sum, the prejudicial effect of the evidence does not substantially outweigh its probative value.

### H. Testimony Concerning Defendant's Mental State

Defendant's eighth contention is that testimony which characterized his mental state as "guilt-ridden" after the murder was an improper conclusion which prejudiced the jury.

Dobrovolskis testified that the night before he and defendant were arrested, he (Dobrovolskis) returned home and found defendant lying on the floor, watching television with Dobrovolskis' family. Dobrovolskis testified that defendant was acting "very strange"; defend-

ant did not say hello when Dobrovolskis walked in and he was very quiet. The following exchange occurred:

> "Q. Do you know of any reason that Larry Eyler would act so strange or so guilt-ridden at this time?
>
> MR. SCHIPPERS [defense counsel]: Objection, your Honor, ask that Counsel's statement be stricken. I fail to see the relevancy of this line of questions.
>
> THE COURT: Objection overruled.
>
> MR. RAKOCZY [assistant State's Attorney]: Q. Do you know of any reason that he would be so despondent and guilt-stricken at this time, Mr. Debrovolkis [*sic*]?
>
> A. No."

Defendant argues that the State's irrelevant questions resulted in inadmissible opinions and conclusions by the witness which prejudiced defendant by suggesting a guilty state of mind.

We agree with the State that defendant's contention is waived. At trial, defendant objected only on relevancy grounds. It cannot be said that the questions are not relevant. Ignoring for the moment the question whether defendant was in fact guilt-ridden (which relates to defendant's prejudice argument), it was certainly relevant whether Dobrovolskis knew of any reason why defendant might be guilt-ridden. In this court, defendant contends the testimony constituted improper opinion testimony and that it was prejudicial. This court has consistently held that specific objections waive all grounds not specified. (*People v. O'Neal* (1984), 104 Ill. 2d 399, 407.) Defendant has waived the two grounds he raises for the first time in this court. Even in the absence of a waiver, defendant would not be entitled to a new trial. Viewing the record as a whole, we are convinced that the admission of the challenged testimony, assuming *arguendo* it was error, was harmless beyond a reasonable doubt. *People v. Taylor* (1984), 101 Ill. 2d 508, 517.

## I. Alleged Discovery Violation

Defendant next contends that the State's failure to disclose a certain statement made by him violated due process and Illinois discovery rules.

A week into the trial, during arguments outside the presence of the jury, the State sought a ruling on the admissibility of a leather vest owned by defendant. The State informed the court that a witness would identify the vest. Further, the witness would testify that the defendant told him that he (defendant) attempted to wash something off the vest at one time and that is why it is stiff in some spots. The defendant objected, stating that he had not been informed of such a statement. See 107 Ill. 2d R. 412(a)(ii).

The court ruled that the vest would be admitted in order to show the size of the defendant at the time of the murder; there had been testimony that he had lost a lot of weight between the murder and the trial. The State explains in its brief that defendant's size was an important issue because the jury had to determine whether defendant had the strength to bind and restrain a 145-pound, 15-year-old boy. (Defendant was 6 feet tall and weighed 170 pounds at the time of his arrest.) The court also ruled that the statement concerning washing the vest was admissible. Defendant then moved for a mistrial, which was denied.

Defendant contends that the statement was subject to the discovery rules because it suggested that defendant got blood on the vest during the murder or concealment of the murder. While it is debatable whether the evidence is a "statement" for purposes of discovery (the State characterizes it as "domestic chit-chat") we will assume *arguendo* that it is.

In *People v. Weaver* (1982), 92 Ill. 2d 545, we stated:

"Rule 415(g) (73 Ill. 2d R. 415(g)) provides an array of sanctions against a party that has failed to comply with an applicable discovery rule. *** In general, the judgment of the trial judge is given great weight. [Citations.] A reviewing court will find an abuse of discretion, however, when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate that prejudice." 92 Ill. 2d at 558-59.

Defendant contends that the late disclosure of the statement prejudiced him by bolstering the evidence that defendant tried to conceal the murder after the defense had committed itself to a strategy of contesting defendant's involvement in the concealment.

Our response to this argument is threefold. First, defendant's contention rests on the assumption that the jury would infer that defendant made the statement to the witness (Dobrovolskis) after Bridges was murdered. Yet the record reflects that defendant made no attempt on cross-examination to establish when the statement was made. (On direct examination, Dobrovolskis testified that "at one point in time" defendant told him defendant washed the vest.) In other words, it would appear that defendant himself might have eliminated whatever prejudice he perceives, but made no attempt to do so.

Second, defendant requested exclusion of the evidence and, when that was denied, a mistrial, both of which are extreme sanctions not favored when an alternative exists. (*Weaver*, 92 Ill. 2d at 561.) He did not ask for either a recess or continuance. As we previously stated: "If that statement was so earthshaking as to require complete reorganization of the defendant's case, counsel should have asked for a continuance or recess for that purpose before [the witness] testified. His failure to do so is persuasive evidence that the prejudice here alleged was in fact trivial." *People v. Foster* (1979),

76 Ill. 2d 365, 384; see also *People v. Loggins* (1985), 134 Ill. App. 3d 684.

Third, and most significantly, contrary to defendant's assertion that this was a "close case," the evidence that defendant concealed the murder is overwhelming. This evidence included, among other things, the testimony of the two janitors concerning defendant's carrying the garbage bags, the blood found all over the apartment, defendant's fingerprints on the garbage bags, a hacksaw blade and an awl found in defendant's apartment, and Dobrovolskis' testimony concerning the material that came up from the kitchen drain when he unplugged it. In these circumstances, defendant's argument that had he known of the statement concerning the vest, he might have conceded guilt for concealment of a homicide, is ludicrous.

In sum, assuming a discovery violation occurred, defendant was not prejudiced by it and accordingly is not entitled to a new trial.

## III. DEATH PENALTY ISSUES

Defendant raises five challenges to his death sentence. One contention is that the death penalty is inappropriate in a circumstantial evidence case. The remaining four contentions challenge the constitutionality of the death penalty statute. Defendant does not challenge the admission of the evidence against him at the hearing, nor does he contend that the requirements of the statute (assuming their validity) were not met in this case. Accordingly, we find it unnecessary to set out the evidence introduced in aggravation and mitigation.

First, defendant contends that the death penalty is inappropriate because the case against him was circumstantial and there is a possibility that a particular person other than defendant committed the murder.

Defendant cites no authority for the proposition that in a circumstantial evidence case, the death penalty is inappropriate, and we reject it. Defendant relies on certain opinions, primarily dissenting opinions, which generally state that even after a finding of guilt beyond a reasonable doubt, a sentencer might still have some residual doubt, and should be permitted to consider such doubt in imposing sentence. See *Spaziano v. Florida* (1984), 468 U.S. 447, 488 n.34, 82 L. Ed. 2d 340, 370 n.34, 104 S. Ct. 3154, 3177 n.34 (Stevens, J., concurring in part & dissenting in part).

Here the sentencer, the trial court, expressly stated: "There's no doubt in my mind that you committed the aggravated kidnapping and murder of Danny Bridges. I think the evidence is overwhelming." Far from entertaining any notion that Little may have committed the murder, the court instead explained that the evidence adduced at the hearing showed that this was not a one-time act; defendant had committed acts of violence against others. The court referred to the murder as "a killing which was so brutal and heinous that it truly defies description." The court concluded that defendant is an "evil person" who truly deserves to die for his acts, and that death is the only "just sentence." The imposition of the death penalty was not inappropriate in this case.

Defendant also raises several constitutional issues which have been considered and rejected by this court in other cases. We decline defendant's invitation to reconsider and reject our prior rulings, and therefore address each contention only briefly.

Defendant contends that his jury waiver for the death penalty hearing was inadequate because the court failed to determine if defendant understood that a single juror's vote would preclude imposition of the death penalty. This court has consistently declined to require trial

courts to inform defendants of the jury unanimity requirement before accepting a jury waiver. (*People v. Ashford* (1988), 121 Ill. 2d 55, 81 (and cases cited).) We have reviewed the record and are convinced that defendant knowingly and intelligently waived a sentencing jury.

Next, we have considered and rejected the contention that the Illinois death penalty statute violates due process because it fails to require the State to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the death penalty. (*People v. Free* (1983), 94 Ill. 2d 378, 421.) In any event, it appears that the trial court found not only that there were no mitigating factors sufficient to preclude imposition of the death penalty, but that there was no mitigation at all. When imposing sentence, the court addressed defendant and stated that it looked for mitigating factors, "but after considering all the evidence in this hearing this Court can find no such factors. *** If there ever was a person or a situation which the death penalty is appropriate, it's you. You are an evil person. You truly deserve to die for your acts."

We have also rejected defendant's argument that the death penalty statute unconstitutionally places on the defendant the burden of persuasion on the question whether sufficient mitigating circumstances exist to preclude the death penalty. *People v. Whitehead* (1987), 116 Ill. 2d 425, 465.

Finally, we have previously rejected defendant's contention that the Illinois death penalty statute is unconstitutional because it gives the prosecutor discretion as to whether or not a death penalty hearing will be sought. *People v. Olinger* (1986), 112 Ill. 2d 324, 352; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 536-43.

We are aware of the opinion of the United States District Court for the Central District of Illinois, *United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F.

Supp. 1246. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stansberry* (1971), 47 Ill. 2d 541.

For the reasons set forth above, we affirm defendant's convictions and sentence of death. We direct the clerk of this court to enter an order setting Wednesday, March 14, 1990, as the date on which the sentence of death entered by the circuit court of Cook County shall be carried out. Defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a copy of this mandate to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*