THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN G. GLIDEWELL, Defendant-Appellant.

Fourth District   No. 4—92—0493

Argued December 9, 1992.—Opinion filed September 30, 1993.

Ronald L. Lewis (argued) and Harold M. Jennings, both of Jennings, Novick, Taseff, Smalley & Davis, P.C., of Bloomington, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and James Majors (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COOK delivered the opinion of the court:

Following a bench trial, defendant was convicted on three counts of theft by deception and sentenced to 30 months of probation conditioned upon restitution, and 30 days of incarceration in the county jail. Defendant appeals, alleging ineffective assistance of counsel and insufficiency of the evidence to establish guilt beyond a reasonable doubt.

On September 30, 1991, defendant closed his retail carpeting store and filed for bankruptcy. The charges against defendant are based on three sales of carpeting through the carpeting store on September 25 and 28, 1991. In each instance, the purchasers received neither the carpeting ordered nor a refund of what they had paid. Because we find guilt has not been proved beyond a reasonable doubt and defendant's convictions must be reversed, we need not address the allegations of ineffective assistance of counsel.

In February 1990, defendant was hired as a salesperson by Classic Carpets, a retail carpeting and decorating business owned by Georgine Voorhees and Carol Fisher. Voorhees held two-thirds of the shares of the incorporated business and apparently had provided the $250,000 financing, which was secured by personal collateral. When Fisher left the business the following month, Voorhees offered Fisher's shares to defendant as well as vice-presidency of the corporation. Defendant accepted the shares in April 1990, paying nothing but

agreeing to supply his expertise in selling and measuring carpet and operating the warehouse equipment.

By early 1991, Voorhees decided she wanted to get out of the business and defendant agreed to purchase her shares. The agreement between the parties provided for defendant to pay Voorhees $100,000 in monthly payments of approximately $1,700, plus 1% of gross income for 15 years, beginning May 1992. Voorhees warranted the outstanding indebtedness of $250,000 was not a debt of the corporation but solely her personal obligation. The contract was signed April 26, 1991. The lease for the premises was assigned to defendant and he subsequently made two payments on the $100,000 buy-out agreement. At the time of the sale the corporation had accounts payable which Voorhees represented to be $20,000 to $30,000.

After assuming sole ownership of the business, defendant instituted new employee policies. He informed the sales staff they should no longer place their own carpet orders with the mill, since he wanted to consolidate orders of the same material to obtain the benefit of a lower yardage price on an entire roll. Defendant put the sales staff on commission instead of salary and took over the scheduling of carpet installation himself. He also instituted a policy of offering customers a 10% discount if they paid full price at the time of order, a practice similar to that utilized by a competitor.

The sales staff apparently disagreed with these policies and walked out on May 13, 1991, some of them advising customers that merchandise which they had ordered would not be delivered. Additionally, some of the staff had continued to place carpet orders with the mill despite the directive that orders would be consolidated so that double carpeting was received at the store for some purchase orders.

Defendant hired an accountant to advise him how to set up his own books for the corporation and his wife quit her job as a nurse to work at Classic Carpets. Defendant began receiving bills from suppliers on accounts payable, some of which were past due from 1989. In June 1991, defendant's accountant determined that as of the date defendant purchased the business in April 1991 accounts payable amounted to $83,000, rather than the $20,000 to $30,000 represented by Voorhees. To ameliorate the demands of creditors, the accountant suggested defendant try to get help through a small business loan, get additional money from Voorhees, or file for bankruptcy. The accountant testified that defendant had a negative reaction to the suggestion of bankruptcy. Defendant then contacted a lawyer to institute a fraud action against Voorhees and to prepare a letter to creditors to

arrange a system of monthly payments. Defendant met with a financial consultant at his store on September 19, 1991, seeking advice on how to obtain a small business loan. The consultant testified that upon review of the store's financial records it was clear defendant was bankrupt, but she felt defendant might be able to continue doing business by managing his creditors.

On September 25, 1991, Ann Mayberry had the defendant come to her home to measure for carpeting. At that time she gave defendant a check for $1,032.99, half of the total purchase price for carpeting she ordered. Mayberry stopped by the store Monday or Tuesday of the following week, but a sign was posted, "closed for inventory." Mayberry's check was deposited in the store's bank account on September 26 and she never received any carpeting or a refund of her deposit.

Romana Mooney testified the defendant measured for carpeting at her home on September 26, 1991. He told her that if she paid the full price of the carpeting at the time of order, she would receive a 10% discount. On Saturday, September 28, 1991, Mooney gave defendant a check for $2,278.38, the full purchase price of the carpet less the 10% discount. Mooney returned to the store on Monday, September 30, and saw a sign reading "closed for inventory." She never received any carpeting or return of the funds she gave the defendant.

Frank Connoway testified that someone from Classic Carpets came out to measure carpeting for a house he was building. On September 28, 1991, Connoway gave defendant a check for $3,290, the full purchase price for his carpet order. On the following Thursday, Connoway returned to the store and saw a sign posted "filing for bankruptcy." Connoway never received any carpeting or a return of his money.

Darrell Collonius came to the carpet store on September 28, 1991, intending to order approximately 200 yards of carpet. Defendant had an appointment with Collonius to measure for the actual yardage on September 30, 1991. Defendant phoned him on the evening of September 30 and told Collonius he could not measure due to bankruptcy. Collonius had not given defendant any money.

The defendant's wife, Rhonda, testified that during the month of September she had paid routine bills incurred by the store. She also paid $500 on a past-due debt with the local newspaper and placed new advertising which ran in the newspaper editions of September 28 and September 30, 1991. She stated that on Sunday, September 29, 1991, as a result of the culmination of pressures and stress from the store and the sporadic receipt of paychecks by herself and defendant, she

left defendant and took their child with her, not informing defendant of their whereabouts.

Defendant testified that on Monday, September 30, 1991, he received a letter dated that same day from his main carpet supplier demanding payment of $25,000 within 10 days on the store's past-due bill or the account would be referred to collections. The afternoon of that same day, defendant and his wife contacted their attorney, then permanently closed the store.

Defendant testified that during September 1991, he paid bills such as rent and utilities for the store, made monthly payments on equipment such as the Hyster and the van, sent the carpet supplier a check for $6,000, paid the payroll for his carpet installers, and rotated the tires on the van. Defendant submitted as evidence shipping invoices from the mill indicating 13 separate carpet sales were made through the store during September, and he testified the mill attempted to deliver other shipments after the store closed its doors. He stated that at no time prior to September 30 had he intended to file for bankruptcy.

Matt Haversperger, a 19-year-old salesperson formerly employed at defendant's store, related a conversation he had with defendant on September 23 regarding defendant's plans for the business.

"[H]e told me that what he had planned on doing was staying open thirty or forty more days, then taking the money from the profits for what not [sic] and putting it back and starting another business, and that way I would have job security more or less if I went along with it."

During cross-examination of Haversperger, defense counsel elicited the following testimony:

"Q. [Defense Counsel:] All right. Now, isn't it true, he did discuss with you about the bankruptcy?

A. [Haversperger:] Yes.

Q. About the potential bankruptcy, and he discussed with you potentially finding other avenues to keep the doors open, and isn't it true, he never said that I'm going to bankrupt this store out and run off with the money and open another business? Isn't that what you surmised from the circumstances?

A. No, that's what he talked about doing."

Based on the three payments received for the purchase of carpeting by the defendant on September 25 and 28, 1991, he was indicted by the grand jury on three counts of theft by deception of over $300 pursuant to sections 15—4(e) and 16—1(a)(2) of the Criminal Code of 1961 (Code) in that he accepted currency purportedly to pay for car-

peting, knowing the carpeting would not be delivered. (Ill. Rev. Stat. 1991, ch. 38, pars. 15—4(e), 16—1(a)(2).) Following a bench trial held April 1 and 2, 1992, defendant was convicted on all three counts.

In determining whether the elements of the charged offense have been proved beyond a reasonable doubt, the relevant question is whether, after viewing evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) A criminal conviction will not be set aside unless the evidence is so unreasonable, impossible or unsatisfactory as to create a reasonable doubt of defendant's guilt. In reviewing the determination of the trier of fact, a court cannot substitute its assessment of the evidence and inferences to be drawn therefrom for that of the trier of fact. *People v. Bowen* (1993), 241 Ill. App. 3d 608, 619, 609 N.E.2d 346, 355-56.

The State was required to prove defendant committed theft by deceptively obtaining control of his customers' cash payments by a promise of delivery of carpeting which he did not intend to perform or knew would not be performed, and with an intent to permanently deprive the owner of the use or benefit of his property. (See Ill. Rev. Stat. 1991, ch. 38, pars. 16—1(a)(2), 15—4(e).) However, defendant's failure to supply the carpeting to his customers is not of itself evidence that defendant did not intend to do so. (Ill. Rev. Stat. 1991, ch. 38, par. 15—4(e).) Defendant admitted he accepted money for carpet sales made September 25 and 28, 1991, and did not supply any of the carpeting purchased. The central issue at trial was the question of the defendant's intent at the time he accepted payment for the carpet orders.

The trial judge, in finding the defendant guilty on all three counts, noted that defendant's credibility was "sorely lacking." Credibility determinations by the trial judge are entitled to great deference; it is not the function of the reviewing court to retry the defendant. (*People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268.) However, in this case, the trial court's assessment of defendant's credibility cannot be equated with proof. That proof would have to show defendant's intent to obtain his customers' funds without supplying any carpeting, or permit the requisite inference of guilt to be drawn. The uncontested facts suggest that defendant was attempting to routinely continue operations. There was no evidence that defend-

ant personally obtained any of his customers' funds. The facts give rise to a reasonable doubt of defendant's guilt.

The State presented two separate theories on proof of intent: (1) defendant's intent could be shown by his knowledge of impending bankruptcy; or (2) defendant planned to "stash" customer funds intended for payment to carpet suppliers. It is not evident from the record on which, if either, of these theories the court based its determination of defendant's guilt.

As to the first, under the language of the theft by deception statute, grounds for conviction would appear to exist if defendant obtained money for the sale of carpeting and at the same time was aware of a substantial probability the carpeting would not be delivered. (See Ill. Rev. Stat. 1991, ch. 38, par. 4—5(a) (knowledge defined as an awareness of the substantial probability a material fact exists).) It could be argued that anyone considering bankruptcy is aware of a substantial probability that goods being sold will not be delivered. We reject that argument. Accepting payment for goods after the decision has been made to file for bankruptcy may constitute theft by deception, but the same should not be true before the decision is finally made, even though there is some likelihood the decision will be made. A defendant should not be punished for attempting to avoid bankruptcy if at all possible. We cannot conclude the statute makes the contemplation of filing for bankruptcy, without more, sufficient to constitute theft by deception. While the filing of a petition for bankruptcy does not shelter a party and does not provide a defense to the prosecution of criminal proceedings for criminal conduct (see *Barnette v. Evans* (11th Cir. 1982), 673 F.2d 1250, 1251; *Parker v. United States* (1st Cir. 1946), 153 F.2d 66, 71; 11 U.S.C. §523(a)(2)(A) (1988)), the purpose of the theft by deception statute is to penalize criminal theft, not the decision to go into bankruptcy, which is a right available to defendant under Federal law. It is the very purpose of the Federal bankruptcy law to " 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh, free from the obligations and responsibilities consequent upon business misfortunes.' " *Local Loan Co. v. Hunt* (1934), 292 U.S. 234, 244, 78 L. Ed. 1230, 1235, 54 S. Ct. 695, 699, quoting *Williams v. United States Fidelity & Guaranty Co.* (1915), 236 U.S. 549, 554-55, 59 L. Ed. 713, 716, 35 S. Ct. 289, 290.

For a merchant conducting business in the normal course, something more than his contemplation of a petition for bankruptcy is necessary to comprise criminal activity. In this case, it is the bankruptcy filing, rather than criminal activity by defendant, which has precluded

performance of the three carpet contracts. The State's evidence, through Haversperger's testimony, indicated defendant intended to keep the store open for 30 or 40 days; had defendant been able to do so, the contracts in question could have been performed. There is *no evidence* defendant did not intend to perform the three contracts at the time of sale, nor is there any evidence from which the requisite inference of intent could be drawn. (*Cf. People v. Riner* (1992), 234 Ill. App. 3d 733, 740, 600 N.E.2d 1308, 1312 (defendant had no intention of performing his contract at the time he received payment).) The evidence shows defendant purchased a business overloaded with debt, attempted in good faith to keep it going through management of creditors' demands, and eventually was forced to seek the protection of the bankruptcy laws. None of this is activity penalized under the criminal statute.

The State's second theory for showing criminal intent, an alleged scheme to "stash" customer funds, is derived from the testimony of Haversperger, who said defendant planned to keep the store open 30 or 40 days, "tak[ing] all the money that we could" or "taking the money back from the profits for what not [*sic*]" and starting another business. While these statements can fairly be read as an anticipation by defendant of opening another business in the future with money he legitimately could make from Classic Carpets, there is no evidence defendant intended to personally retain or hide any of the payments received for the purchase of carpeting. Defendant testified without contradiction that all monies received from customers were deposited in the store's bank account. Ann Mayberry exhibited her cancelled check payable to Classic Carpets and testified it had been stamped as deposited in the store's bank account the day after it was tendered to defendant. There is no evidence that any part of the customers' payments was diverted from the store's bank account or used to pay unrelated debts of the defendant. The bankruptcy estate would have assumed control over the payments made here, for the benefit of creditors. The absence of any evidence that defendant secreted funds intended for the purchase of carpeting or used funds to pay nonbusiness expenses is inconsistent with the existence of a criminal intent to deprive customers of their property through theft by deception.

In commenting on the defendant's lack of credibility, the court noted defendant's testimony that he placed orders with his carpet supplier twice a month, although the evidence indicated orders had been placed as frequently as 12 times a month. Defendant's testimony that the frequency of placing carpet orders varied appears to be consistent with the new ordering policy he initiated. In any event it is

not clear what relevance defendant's testimony had to proving that defendant intended to deprive the three customers of their property. Failure to place the carpet orders with the supplier—within the three days in which defendant might have done so prior to the store's closure for bankruptcy—was not shown to be a deviation from prior business practice, nor did it constitute proof of an intent to deceive, as required by the statute. It was the filing of the bankruptcy petition, and not the failure to place the carpet orders with the supplier, which operated to deny the customers the carpeting they had purchased. Had defendant in fact placed orders with the supplier at the time of sale, the customers still could not have received delivery and installation of the carpeting by September 30, the date the store was closed. There is no evidence the funds received were diverted to purposes unrelated to business expenses.

We find the evidence in this case has failed to demonstrate proof of guilt beyond a reasonable doubt. Therefore, the convictions must be reversed.

Reversed.

STEIGMANN, P.J., and GREEN, J., concur.