THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK COLE, Defendant-Appellant.

Fourth District   No. 4—89—0143

Opinion filed February 15, 1990.

STEIGMANN, J., specially concurring.

Daniel D. Yuhas and M. Jeffrey Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SPITZ delivered the opinion of the court:

After a jury trial, defendant was convicted of two counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—16(d)) and was sentenced to concurrent three-year terms of imprisonment. Defendant appeals, arguing (1) the trial court erred in allowing testimony concerning hearsay statements made by the alleged victim to an acquaintance and to her mother on the day following the alleged offense; (2) he was not proved guilty beyond a reasonable doubt because the alleged victim's testimony concerning the offense was neither clear and convincing nor substantially corroborated; and (3) the order of restitution must be reversed because the amount of restitution ordered was not based on actual losses and expenses already incurred, but on expected counseling expenses.

### I. THE EVIDENCE

According to the evidence adduced at trial, defendant's conduct on which the charge was based occurred on Sunday, July 18, 1988, at which time defendant, age 28, engaged in sexual conduct with S.L.M., a 13-year-old girl baby-sitting in his home.

S.L.M.'s family lived in La Grange, Missouri, and S.L.M.'s mother worked with defendant's wife, Mrs. Cole, at a laundromat in Quincy, Illinois. Mrs. Cole had mentioned to S.L.M.'s mother that Mrs. Cole was having some difficulty in finding baby-sitters for her two young daughters, who were seven and eight years old. S.L.M.'s mother then offered her two teenage daughters to baby-sit for Mrs. Cole and

agreed to permit S.L.M., one of her daughters, to baby-sit on the night of Saturday, July 17, 1988, at the Coles' home in Mendon, Illinois.

Because of the lateness of the hour at which Mrs. Cole expected to return home, Mrs. Cole and S.L.M.'s mother agreed that S.L.M. would spend the night at the Cole home. On the following day, S.L.M. accompanied the Cole family swimming in the afternoon and bowling in the evening. Mrs. Cole's daughters then asked that S.L.M. be allowed to spend an additional night at their home, and S.L.M.'s mother agreed.

The Cole daughters went to bed about 9 p.m. on Sunday night, and Mrs. Cole retired at about 11:30 p.m. Defendant and S.L.M. stayed up, talking and watching television in the living room. Mrs. Cole, sleeping in the couple's bedroom just off the living room and within 10 feet of the living room sofa, dozed in and out of sleep and heard the television as background noise without being able to understand the words spoken. S.L.M. was to sleep on the sofa.

S.L.M. testified that when Mrs. Cole went to bed, defendant was sitting on the opposite end of the sofa and he started putting S.L.M.'s bare feet on his legs. She pulled her feet away, but he put them back. He then got up and moved over to her side. Then he pulled her T-shirt up and started kissing her on her chest and lips. At some point he pulled her bra down away from her breasts, pulled her blue-jean shorts off, pulled her underwear over, and put his fingers into her vagina. S.L.M. testified that this conduct, from the time defendant put her feet in his lap and through the fondling, lasted about half an hour to an hour. During this time, she did not scream or hit him, but she told him to stop. He did not. She said that after a while defendant got up and went toward the door, looked out the window, and said he saw a police officer about a block away on the corner. She said that defendant told her not to open the door, and then he started looking for papers of some kind. He later went to bed, and she remained awake for about an hour.

Mrs. Cole, scheduled to work the following morning, had agreed before she went to bed that rather than have S.L.M. get up very early in the morning to go home, S.L.M. would go home when Mrs. Cole returned from work. When Mrs. Cole left for work, S.L.M. was still sleeping. For most of Monday, S.L.M. spent the day with defendant and his daughters, but was never alone with defendant. When D.M., a 13-year-old boy S.L.M. knew, came to the Cole residence, S.L.M. told him what had happened. He was the first person whom she told. Mrs. Cole came home around 1 p.m. About 10 p.m. that

night, Mrs. Cole, accompanied by her daughters, returned S.L.M. to her mother at the laundromat in Quincy. Mrs. Cole's daughters again asked that S.L.M. be allowed to stay another night, but S.L.M.'s mother said no. After Mrs. Cole and her daughters left, S.L.M. told her mother of the events of Sunday night and early Monday morning.

The victim's mother testified as to the baby-sitting arrangement with the Coles and their agreement that S.L.M. would stay at the Cole's home Sunday, Sunday night, and Monday during the day. She further testified that when Mrs. Cole and her daughters brought S.L.M. to the laundromat Monday night, Mrs. Cole's daughters asked that S.L.M. be allowed to stay overnight again. She testified that S.L.M. "kind of made a face," so she told them that S.L.M. could not stay. The victim's mother testified that Mrs. Cole then mentioned the possibility of S.L.M.'s baby-sitting on future weekends. She testified that after Mrs. Cole and her daughters left, S.L.M. said, "Mom, do I have to go back?" and, when she looked at S.L.M. and asked why, S.L.M. said she did not want to go back, began crying, and told her "what had happened."

Defendant took the stand in his own behalf and denied touching or kissing S.L.M. According to defendant, after his wife went to bed on Sunday night, he left the house to call a man about buying a car. The Coles had no telephone in their home. After returning, he looked for some time cards, picked up things in the front room, got a blanket and some books for S.L.M., and went to bed. Defendant was impeached with a misdemeanor theft conviction from 1978.

Defendant's wife testified she had been married to defendant for three years. On the Sunday night in question, her husband went to bed shortly after she did. He even came in and spoke to her several times after she went to bed. She saw nothing unusual happen that night between her husband and S.L.M., and, although she was in bed just around the corner from the couch, she heard nothing going on in the front room other than defendant and S.L.M. watching television and talking.

Mrs. Cole testified that S.L.M. was asleep when she got up to go to work in the morning. She planned to take S.L.M. back to Quincy when she took her husband to work at 3 p.m. According to Mrs. Cole, S.L.M. declined a ride back with the couple when she took defendant to work. She further testified that when she took S.L.M. back to the laundromat in Quincy Monday night, it was S.L.M.—and not her daughters—who asked if she could again stay overnight at the Coles' residence.

## II. TESTIMONY CONCERNING THE VICTIM'S STATEMENT

We first consider defendant's argument that the statements S.L.M. made to D.M., the 13-year-old boy, at least seven hours after the alleged offense, and to her mother almost 24 hours after the alleged offense, were inadmissible hearsay because they (1) do not qualify as spontaneous declarations, and (2) were not independently admissible under the corroborative complaint rule. The State argues defendant has waived any error concerning statements of S.L.M. to D.M. or to her mother. We agree.

### A. WAIVER OF ANY CLAIMED ERROR

Defendant filed a pretrial motion *in limine* to bar the admission of S.L.M.'s statements to various third parties, including D.M. and S.L.M.'s mother. At the hearing on that motion, defendant presented two arguments: first, the statements did not qualify as prompt complaints; and second, prompt complaint testimony is limited to testimony that a complaint of the act occurred, but does not include details of the act or identification. The State indicated it was not going to seek the admission of some of S.L.M.'s statements, and the court then ruled that D.M. and the victim's mother could testify to the fact that a complaint had been made, but could not testify to any other details.

At trial, no objection was interposed when complainant testified about telling D.M. or her mother "what had happened" on the day after the offense. In addition, no objection was interposed when complainant's mother was questioned on this same point. No detail of S.L.M.'s complaint was elicited from either S.L.M. or her mother. D.M. did not testify.

■ To preserve any issue about whether S.L.M.'s statements were timely enough to qualify as prompt complaints, objections should have been made at trial with this as the stated basis. The failure of defendant's trial counsel to raise any objections to testimony about S.L.M.'s telling "what had happened" appears to us to be hardly inadvertent; rather, counsel's failure appears to be due to his satisfaction with the court's ruling on his motion *in limine*. That defendant now has different counsel on appeal who views the issue differently than did trial counsel is of no moment. The failure of defendant to object at trial waives this issue on appeal. Further, the issue was not preserved by post-trial motion. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

### B. TESTIMONY CONCERNING VICTIM'S STATEMENTS IS NOT HEARSAY

On the merits, we find no error in the admission of the alleged

hearsay testimony concerning S.L.M.'s statements because that testimony was not hearsay. Hearsay is defined as follows:

" 'Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' (McCormick, Law of Evidence, sec. 225; see also, Cleary, Handbook of Illinois Evidence, sec. 31.1 *et seq.*)" *People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741.

■■ The testimony at issue in this case relates to statements made by S.L.M. to her mother and to D.M. telling them "what had happened." This testimony does not contain any extrajudicial statement offered to prove the truth of the statement contained therein. Instead, the testimony is a mere *description*, alluding in the most general terms to the subject matter of the conversation. As such, it is not hearsay.

### III. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the State's case, consisting primarily of S.L.M.'s testimony, is insufficient to sustain his convictions. Defendant argues that S.L.M.'s testimony is neither clear and convincing nor substantially corroborated. We disagree. The complaining witness, a 13-year-old girl on her first baby-sitting excursion, was from La Grange, Missouri, and was baby-sitting in a house which had no phone in Mendon, Illinois, for a couple with whom she had no prior acquaintance. Her testimony was unwavering. Acts of sexual fondling are, by nature, private, and the absence of witnesses other than the victim should come as no surprise. Similarly, the acts complained of in this case would be expected to leave no physical signs of abuse.

■■ The verdicts here reflect the jury's assessment of the credibility of the witnesses, a function particularly within its province as the fact finder. All the deficiencies in the State's case now being argued on appeal were similarly argued to the jury which actually saw and heard these witnesses. A reviewing court will not reverse a conviction unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to the defendant's guilt remains. (See *People v. Eyler* (1989), 133 Ill. 2d 173, 191; see also *People v. Yates* (1983), 98 Ill. 2d 502, 518-19, 456 N.E.2d 1369, 1377-78, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.) This is not such a case.

#### IV. THE ORDER OF RESTITUTION

The presentence report in this case referred to the victim-impact statement, which stated professional counseling for S.L.M. was expected to take three to six months, listing "anticipated expenses" as $400 to $500. Defense counsel argued for imposition of a four-year term of probation, including an order of restitution as an increment of the sentence. When the State asked for a restitution order of $500, defense counsel objected, arguing restitution could not be based on prospective amounts not yet incurred by the victim. The trial judge ordered the circuit clerk to withhold $500 of defendant's bond money so that it could be applied to counseling. Although the court indicated that if the counseling cost less than $500, the money would be refunded to defendant, no time frame was fixed for determining if a refund should be made.

■ In a criminal case, the sentencing order should be sufficiently certain so as to not require further action by the court or an agent of the court to ascertain its meaning. Here, the trial court affixed a definite upper limit on defendant's restitution, but the order was not sufficiently certain so that it could be enforced without further judicial action. Compare *People v. Nash* (1989), 183 Ill. App. 3d 924, 931, 539 N.E.2d 822, 826.

■ We conclude that the statutory provision on restitution (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 1005—5—6(g)) permits an order of restitution for prospective counseling expenses in sex abuse cases. In order to provide for the finality of a sentence, however, such an order should incorporate provisions specifying the following: (1) a maximum dollar limit; (2) a time frame for counseling and proof of expenses incurred, *e.g.*, within one year of sentencing, or the term of probation where probation is imposed; (3) that the court services department or probation office monitor and administer the payment of restitution; (4) in the event that a dispute develops, that either party may petition the court for resolution thereof; and (5) when bond money is being withheld for use for restitution, a date when any bond monies not so used will be remitted to defendant. On the facts of this case, this matter of restitution can easily be resolved by the trial court on remand, in accordance with the directions we have now provided.

#### V. STANDARD OF REVIEW IN SEX OFFENSE CASES

As we stated earlier in this opinion, we disagree with defendant's argument that the testimony of the complainant, S.L.M., is neither clear and convincing nor substantially corroborated. The special concurrence would have us abandon these tests as we review the evi-

dence in sex offense cases. While it *may* be time to declare these tests no longer valid, we do not believe that it should be done by this court.

Affirmed and remanded with directions.

LUND, J., concurs.

JUSTICE STEIGMANN, specially concurring:
While I fully agree with the disposition of this case, I write separately to state my views that the standard of review utilized by the court is antiquated, inconsistent with the current thinking of our supreme court, and should be abandoned.

### A. REQUIREMENT THAT TESTIMONY OF VICTIM OF SEX OFFENSE BE EITHER SUBSTANTIALLY CORROBORATED OR CLEAR AND CONVINCING SHOULD BE REPUDIATED

In arguing that the evidence was not sufficient to prove him guilty beyond a reasonable doubt, defendant argues that the the complaining witness' testimony in a sex offense case must be either substantially corroborated or clear and convincing and that S.L.M.'s testimony was neither. In support of this argument, defendant cites numerous cases, the primary ones being *People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285, and *People v. Server* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131. The authority defendant cites is accurate, but I believe it to be no longer valid.

In *People v. Bryant* (1986), 113 Ill. 2d 497, 512, 499 N.E.2d 413, 419, and more recently in *People v. Eyler* (1989), 133 Ill. 2d 173, the Illinois Supreme Court had occasion to consider arguments that "proof beyond a reasonable doubt" was not sufficiently descriptive of the State's burden of proof. In *Bryant*, the supreme court held that the second paragraph of Illinois Pattern Jury Instructions, Criminal, No. 3.02 (2d ed. 1981) should no longer be used. That paragraph—stating that the evidence in an entirely circumstantial evidence case must be sufficient to "exclude every reasonable theory of innocence"—was deemed by the court to be both "obscure and misleading." *Bryant*, 113 Ill. 2d at 512, 499 N.E.2d at 420.

In *Eyler*, defendant contended that the State's evidence, being entirely circumstantial, was insufficient on appeal to sustain his convictions because it did not exclude every reasonable hypothesis of innocence. The supreme court rejected this argument and held implicitly

that henceforth there is to be but one standard of review regarding the sufficiency of the State's evidence:

"The principles governing our review of defendant's challenge to the sufficiency of the evidence are well established and were recently set forth in *People v. Phillips* (1989), 127 Ill. 2d 499, 509-10. It is, of course, the jury's function to determine the accused's guilt or innocence and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt. It is not this court's function to retry the defendant. The United States Supreme Court has stated that 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; see also *People v. Collins* (1985), 106 Ill. 2d 237, 261.) Moreover, it is for the jury to weigh the credibility of witnesses and to resolve conflicts or inconsistencies in their testimony. (*Phillips*, 127 Ill. 2d at 514.) Applying these principles to the case at bar, we readily conclude that defendant's convictions are not subject to reversal." *Eyler*, 133 Ill. 2d at 191-92.

These decisions are fully applicable to the issue before this court, which may be summarized as follows: in a case in which a sex offense is charged, is there some requirement imposed upon the State, in addition to proving the defendant guilty beyond a reasonable doubt, to demonstrate either that the evidence is substantially corroborated or that the victim's testimony is clear and convincing? Based upon *Bryant* and *Eyler*, I believe there is not.

Before concluding that the above standards are no longer valid, I carefully considered their origins. I found that exercise to be somewhat akin to turning over a rock and looking underneath.

Lord Hale is apparently the earliest source of the aphorism that rape "is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho ever so innocent." (I M. Hale, Pleas of the Crown 635 (1778).) This eighteenth-century insight was adopted by an early treatise on evidence (3 S. Greenleaf, Evidence §212 (4th ed. 1857)) and by two decisions of the Illinois Supreme Court, *Shirwin v. People* (1873), 69 Ill. 55, 58-59, and *People v. Freeman* (1910), 244 Ill. 590, 594, 91 N.E. 708, 709.

The rule that ultimately evolved from these decisions—that the evidence in a sex offense case must be substantially corroborated or the

testimony of the victim must be clear and convincing—is entirely arbitrary and a reflection of the archaic and sexist views held by nineteenth-century legal practitioners. The attitudes of two State supreme courts in the mid- to late-1800's toward women (who, especially in those times, were almost exclusively the victims of sex offenses) are illustrated by the following decisions.

In 1862, the Supreme Court of North Carolina heard an appeal from a complaint for a divorce brought by a woman who claimed her husband had horse-whipped her. (*Joyner v. Joyner* (1862), 59 N.C. 322.) In reversing the trial court's granting of her request for a divorce, the supreme court stated the following:

"The wife must be subject to the husband. Every man must govern his household, and if by reason of an unruly temper, or an unbridled tongue, the wife persistently treats her husband with disrespect, and he submits to it, he not only loses all sense of self-respect, but loses the respect of the other members of his family ***. Such have been the incidents of the marriage relation from the beginning of the human race. Unto the woman it is said, 'Thy desire shall be to thy husband, and he shall rule over thee,' Genesis, chap. 3, v. 16. It follows that the law gives the husband power to use such a degree of force as is necessary to make the wife behave herself and know her place." *Joyner*, 59 N.C. at 325.

In 1875, the Wisconsin Supreme Court denied the petition of the first woman who sought to be admitted to the bar of that court. (*In re Motion of Goodell* (1875), 39 Wisc. 232.) In its ruling, the court offered the following nineteenth-century insights:

"This is the first application for admission of a female to the bar of this court. And it is just matter for congratulation that it is made in favor of a lady whose character raises no personal objection: something perhaps not always to be looked for in women who forsake the ways of their sex for the ways of ours.
* * *
*** The law of nature destines and qualifies the female sex for the bearing and nurture of the children of our race and for the custody of the homes of the world and their maintenance in love and honor. And all life-long callings of women, inconsistent with these radical and sacred duties of their sex, as is the profession of the law, are departures from the order of nature; and when voluntary, treason against it. *** There are many employments in life not unfit for female character. The profession of the law is surely not one of these. The peculiar qualities

of womanhood, its gentle graces, its quick sensibility, its tender susceptibility, its purity, its delicacy, its emotional impulses, its subordination of hard reason to sympathetic feeling, are surely not qualifications for forensic strife." *Goodell,* 39 Wisc. at 240-45.

The rule that I would have this court reject is, in its own way, as insulting to women as are the above quotations. Women still constitute the overwhelming majority of victims of sex offenses, and *the testimony of no other category of crime victim is held automatically suspect,* requiring "substantial corroboration" or that it be "clear and convincing" in order to sustain a conviction. The time has come to rid the law of this anachronism.

Not even the testimony of *accomplices* has been scrutinized in this fashion. In *People v. Pace* (1987), 163 Ill. App. 3d 1012, 1014-15, 517 N.E.2d 299, 301-02, this court stated the following:

"The testimony of an accomplice, either corroborated or uncorroborated, can be sufficient to sustain a conviction if the jury is convinced beyond a reasonable doubt. [Citations.] Whether such testimony forms a sufficient basis for conviction goes to the weight of the evidence. As such, it is properly a function within the province of the jury. [Citations.]

Although accomplice testimony is competent, it is often fraught with serious problems. The accomplice may have been promised leniency or harbor ill will towards the accused. Consequently, it only should be accepted with the utmost caution and subjected to the highest scrutiny. [Citations.]

Defendants insist that where an accomplice's testimony is uncorroborated, it must carry an 'absolute conviction of truth.' [Citation.] Although the 'absolute conviction of truth' language has been used in assessing accomplice testimony, the prevailing test is whether the uncorroborated accomplice testimony establishes the guilt of defendant beyond a reasonable doubt. [Citation.] The credibility and weight afforded such testimony is an issue for the jury."

I am are aware that juries receive a special instruction regarding accomplice testimony. (See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981).) My point is that once a jury has chosen (as it may) to return a guilty verdict based upon the uncorroborated testimony of an accomplice, this court is under no special obligation to determine whether the State's evidence was "substantially corroborated" or whether the accomplice's testimony was "clear and convincing." Those standards of review are applicable only with regard to

*any* woman who happens to be a rape victim, not to some dope dealer who "flips" to turn State's evidence against his fellow dope dealer.

I note parenthetically that an additional problem with the requirement that the testimony of the victim of a sex offense be "clear and convincing" is that the phrase "clear and convincing" is itself a statement of the burden of proof the State must meet in order to prevail in certain types of cases, such as the termination of parental rights in cases involving child abuse or neglect. (See Ill. Rev. Stat. 1987, ch. 37, par. 802—29.) Consideration by a court of review of whether the victim's testimony is "clear and convincing" when the State already has the burden of proving the defendant's guilt beyond a reasonable doubt is likely to add only confusion to the appellate process.