NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200638-U

NO. 4-20-0638

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 17, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| CARIBE A. JONES, | ) | No. 19CF129 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Knecht and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) Defendant's statutory right to a speedy trial was not violated.

(2) Defendant waived his argument that the trial court erred in allowing him to appear at trial in restraints without first conducting a hearing pursuant to Illinois Supreme Court Rule 430 (eff. July 1, 2010).

(3) Defendant forfeited his argument that the trial court imposed an excessive sentence.

¶ 2     Following a jury trial, defendant, Caribe A. Jones, was convicted of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) and subsequently sentenced to 40 years' imprisonment. Defendant appeals, arguing (1) he was tried in violation of his statutory right to a speedy trial, (2) the trial court erred in allowing him to be placed in

restraints at trial without first conducting a hearing pursuant to Illinois Supreme Court Rule 430 (eff. July 1, 2010), and (3) his sentence is excessive. We affirm.

¶ 3                                                I. BACKGROUND

¶ 4                                               A. The Charge

¶ 5          In January 2019, the State charged defendant with predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)), alleging he "placed his penis in the mouth of [L.B.]."

¶ 6                                          B. The Speedy-Trial Period

¶ 7          Defendant was arrested on June 18, 2019, and remained in custody until his trial began on October 20, 2020. On March 13, 2020, the parties agreed to set the case for trial on April 20, 2020. However, on April 16, 2020, due to the COVID-19 pandemic, the trial court *sua sponte* vacated the trial setting and rescheduled it for May 18, 2020, citing "the Governor's declaration of a state of emergency on March 9, 2020, the entry of Illinois Supreme Court MR 30370 on March 7, 2020, and March 20, 2020, and the Sixth Judicial Administrative orders 2020-01, 2020-02, and 2020-03[.]" On May 12, 2020, the court again *sua sponte* vacated the trial setting due to the orders issued by the supreme court and the Sixth Judicial Circuit and rescheduled it for June 15, 2020. The parties next appeared in court on June 5, 2020.

¶ 8          The day before trial, on October 19, 2020, the court addressed a motion by defendant to dismiss the charge on speedy-trial grounds. The court denied defendant's motion, finding that no more than 99 days of the speedy-trial period had elapsed since defendant was placed in custody. Importantly, the court concluded that the speedy-trial time period had been tolled from April 20, 2020, to June 5, 2020, due to the orders of the supreme court and the Sixth Judicial Circuit.

- 2 -

¶ 9                                C. The Use of Physical Restraints at Trial

¶ 10              On October 19, 2020, the day before defendant's trial commenced, the following

exchange took place at a hearing regarding the possibility of restraining defendant at trial:

> "MR. FLETCHER [(ASSISTANT STATE'S ATTORNEY)]: I would ask
> that the court confirm outside the presence of the jury whether it—with the
> sheriff's office tomorrow whether they have any security concerns. And if so, the
> defendant may—the court may wish to have the defendant remain seated at
> counsel table.
>
> THE COURT: All right.
>
> MR. FLETCHER: And I would be happy to follow the same process so as
> not to *** create a visual disparity.
>
> DEFENDANT: Well, look, as long as we going to be able to be on the
> same level when it comes to picking our jury, then that's most definitely
> understood.
>
> THE COURT: Okay.
>
> DEFENDANT: But if he is able to *** go to the podium and speak, and
> express hi[m]self by standing up, then I would like to be granted that, too.
>
> THE COURT: All right. Yeah, you're—you're both going to—we're not
> going to have different rules for the two of you."

Due to "three disciplinary reports" defendant had received while in custody, the sheriff's office

recommended defendant "wear leg irons during his trial."

¶ 11    The next day, prior to jury selection, the court informed the parties of the recommendation from the sheriff's office and the requirements of Illinois Supreme Court Rule 430. The following exchange then occurred:

"THE COURT: Any comment that you wish to make about that report, or the suggestion that you wear leg shackles only during the trial?

DEFENDANT: Well, we discussed yesterday basically he was just going to be at the table with it anyway.

THE COURT: You will just sit at the table, and Mr. Fletcher would? All right. So you don't object to wearing leg shackles as long as you both stay seated?

DEFENDANT: No, right.

THE COURT: All right.

MR. FLETCHER: Your Honor, it's a—first I might need to stand over here in order to get a clear view of the witness. Second is the—or will we still be using a podium for opening and closing arguments?

THE COURT: I think if we're going to—if [defendant] is going to be shackled, I would think that we should not use the podium, and we can just replace it.

MR. FLETCHER: Okay.

THE COURT: And [defendant], you don't have a problem if Mr. Fletcher just stands at the side of the desk so that he can see the witnesses?

DEFENDANT: No."

¶ 12    During a break in jury selection, the prosecutor informed the court he wished to be able to make eye contact with L.B. during her testimony, and the following discussion ensued:

"MR. FLETCHER: I understand that the court is concerned that if [defendant] is not able to get up, I can't get up. *** I welcome the court's ideas as to how to address this. *** I'm more than happy to swap seats with the defendant, if we take a break between the two. I would address any other alternatives the court has.

THE COURT: All right. [Defendant], anything you want to say about that suggestion?

DEFENDANT: Nope. I don't—the swapping the seats, I'm cool right here, because I need to be able to see the witness, too.

THE COURT: All right. Do you have any objection if Mr. Fletcher just stands in front of the witnesses while he's talking to the witnesses?

DEFENDANT: Yeah, because he can be able to have—like he say, have eye contact and be able to communicate with them without me even *** having knowledge of it.

***

He get[s] a chance to speak to—I apologize. He get[s] a chance to speak to them outside of me being present. When he go[es] to the hallway to talk to the witnesses, he might be able to say a few things to them to make them blend into what it is that he ha[s] to say, a coaching somehow.

THE COURT: Well, he—if he's going to do something like that out in the hallway, it won't make any difference where he stands once we're in the courtroom.

DEFENDANT: That was the purpose of the agreement from the beginning.

THE COURT: I'm sorry?

DEFENDANT: That was the purpose for the agreement from the beginning, to not be able to use the podium.

* * *

THE COURT: My understanding of why we were not using the podium is that *** since we have you in shackles, neither of you would stand up and use the podium, because *** the jury doesn't need to see you walking with shackles on. Where you're seated at the table they can't see your legs, but if you stand up and walk the jurors would be able to see those shackles.

* * *

All right. Anything else you want to say ***?

DEFENDANT: No, sir."

Later in the discussion, the prosecutor noted that the alternate jurors "may well see" defendant's shackles during the trial. The court asked defendant one final time if he objected to the prosecutor examining L.B. from the podium, and defendant responded, "It's basically *** an influence, basically, so." The court ultimately allowed the prosecutor's request to use the podium during his examination of L.B.

¶ 13                                D. The Jury Trial

¶ 14       Defendant's trial commenced on October 20, 2020, and concluded on October 22, 2020, with the jury finding defendant guilty.

¶ 15        L.B. testified that she was ten years old in 2018 and her mother was dating

defendant at the time. She stated there was a day "in the early summer of 2018" when she was

home alone with defendant. L.B. testified she believed her mother was at the food pantry on this

day. According to L.B., defendant asked her to go into the bathroom. L.B. complied with

defendant's request and sat on the toilet. Defendant turned off the lights and stood "[r]ight in

front" of her. L.B. then felt something on her face that she said was larger than a finger. L.B.

testified defendant put his hands on the sides of her head and moved her head back and forth

while his penis was in her mouth. After some time, defendant "stopped" and L.B. returned to the

living room. L.B. did not immediately disclose this incident to her mother because she was

scared and "didn't want to hurt her[,]" but she did eventually disclose it to her grandmother.

¶ 16        Tamela B., L.B.'s mother, testified she dated defendant from February 2018 to

July 4, 2018. Tamela B. recalled a day in "late June or early July" 2018 in which she arrived

home to find defendant alone with L.B.

¶ 17        Robin Mathis testified she runs a food pantry in Champaign. According to her

records, Tamela B. visited the food pantry on June 20, 2018.

¶ 18        Detective Amy Petrilli testified she spoke with defendant at the county jail on

June 19, 2019. Petrilli informed defendant he had been arrested on a warrant for predatory

criminal sexual assault of a child but did not disclose the name of the child-complainant.

Defendant told Petrilli he had not been in Champaign any time around July 2018. Defendant also

told Petrilli he had briefly dated Tamela B. Defendant named each of Tamela B.'s children, but

omitted L.B.

¶ 19        Officer Phillip McDonald testified he went to Tamela B.'s home located on

Springfield Avenue in early November 2018. Officer McDonald identified a map of the relevant

area in Champaign that indicated Tamela B.'s home was located near the intersection of Springfield Avenue and Parking Lot Road.

¶ 20        Troy Blazier, a "case management supervisor for Marion County Community Corrections," testified defendant was on GPS monitoring from January 24, 2018, to July 17, 2018.

¶ 21        Cassie Schmitt testified that she was employed by Track Group, a company that provides GPS monitoring services for Marion County, Indiana. Schmitt testified that according to Track Group records, defendant's device placed him at an address on Parking Lot Road in Champaign for the majority of the day on June 20, 2018.

¶ 22        R.C. testified defendant had dated her mother between 2014 and 2016, when R.C. was between nine and eleven years of age. R.C. testified that when she was about nine years old, she stayed at a hotel in St. Louis with her mother and defendant. One morning at the hotel, R.C. was in bed while her mother was in the shower. R.C. testified she woke up and "felt something touching [her] forehead" that "felt like a penis" and not like a finger. R.C. stated it was dark in the room but she could tell defendant was standing over her with his hips close to her face.

¶ 23                    E. Posttrial Proceedings

¶ 24        Defendant filed several timely posttrial motions in which he argued, in relevant part, his speedy-trial rights were violated. The trial court rejected defendant's contention, finding again that no more than 99 days of the speedy-trial period had elapsed prior to trial.

¶ 25                        F. Sentencing

¶ 26        On December 16, 2020, the trial court conducted a sentencing hearing. According to the presentence investigation report (PSI), defendant was 43 years old at the time of sentencing. The PSI indicated that in addition to numerous misdemeanor convictions and traffic

violations, defendant had four prior felony convictions—three drug offenses and a theft offense—as well as an Indiana conviction for "either intimidation or theft." L.B. submitted a written victim-impact statement. The State presented no additional evidence in aggravation, and defendant presented no evidence in mitigation. In allocution, defendant maintained his innocence.

¶ 27      In sentencing defendant, the court found the following aggravating factors applied: (1) defendant's conduct caused serious harm to L.B., as evinced by her trial testimony and victim-impact statement; (2) defendant had an extensive criminal history; (3) the need to deter others in the community from committing sexual offenses against minors; (4) defendant was on probation or parole when he committed the offense; and (5) defendant "held a position of trust or supervision" with respect to L.B. As for mitigation, the court found defendant was unlikely to commit a similar offense "if he is incarcerated for a long period of time and also likely because he will be required to register as a sex offender for most, if not all, of his natural life after he serves whatever sentence is imposed." The court noted defendant apparently suffered from "some mental issues" but it did not rise to the level of "a serious mental issue." The court also stated, "our statutory scheme requires us to focus on the rehabilitation of offenders but also on the seriousness of the offense" and "the single most important factor in a sentencing decision is the nature and circumstances of the offense." Ultimately, after balancing the applicable aggravating and mitigating factors, the court sentenced defendant to 40 years' imprisonment.

¶ 28      This appeal followed.

¶ 29                    II. ANALYSIS

¶ 30      Defendant argues (1) he was tried in violation of his statutory right to a speedy trial, (2) the trial court erred in allowing him to be placed in restraints at trial without first

- 9 -

conducting a hearing pursuant to Illinois Supreme Court Rule 430 (eff. July 1, 2010), and (3) the court imposed an excessive sentence.

¶ 31                                    A. The Right to a Speedy Trial

¶ 32        Defendant first argues we must vacate his conviction because he was tried in violation of his statutory right to a speedy trial. He contends the trial court erred in finding the speedy-trial time period had been tolled from April 20, 2020, to June 5, 2020, due to the emergency orders issued by the supreme court and the Sixth Judicial Circuit in response to the COVID-19 pandemic, and therefore erred in concluding that only 99 days of the speedy-trial period had elapsed prior to trial. Specifically, defendant maintains the orders "violate Article II, Section 1, of the Illinois Constitution and the well-established principle of the separation of powers." See Ill. Const. 1970, art. II, § 1.

¶ 33        As an initial matter, the State, citing to *People v. Cole*, 193 Ill. App. 3d 990 (1990), contends we "may lack the authority to rule upon the propriety of a Supreme Court directive." That case dealt with the standard to be employed when reviewing the sufficiency of the evidence in a sex offense case. *Id.* At the time, to sustain a conviction in a sex offense case, the evidence had to be substantially corroborated or the victim's testimony had to be clear and convincing. *Id.* at 995. At the conclusion of our decision in *Cole*, we noted that "[w]hile it may be time to declare these tests no longer valid, we do not believe that it should be done by this court." (Emphasis omitted.) *Id.* at 997. We find the State's reliance on this case misplaced for several reasons. First, *Cole* involved a common law rule pertaining to the standard of review in sex offense cases, not an administrative order issued by the supreme court. Additionally, in *Cole*, we stated that, while it may be time to declare the rule no longer valid, "we do not believe that it should be done by this court." *Id.* We did not say that it could not be done by this court or that

- 10 -

we lacked the authority to do so. Thus, because the State fails to cite to any authority holding this court lacks the authority to address the propriety of an administrative order of the supreme court, we will address defendant's argument.

¶ 34 Section 103-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5(a) (West 2018)) (the speedy-trial statute) provides the following:

"(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***. Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record."

"The trial court's determination as to who is responsible for a delay of the trial is entitled to much deference, and should be sustained absent a clear showing that the trial court abused its discretion." *People v. Kliner*, 185 Ill. 2d 81, 115 (1998). "However, the ultimate question as to whether defendant's statutory right to a speedy trial has been violated is a question of law subject to *de novo* review." *People v. Pettis*, 2017 IL App (4th) 151006, ¶ 17.

¶ 35 On March 20, 2020, the supreme court, "[i]n the exercise of the general administrative and supervisory authority over the courts of Illinois conferred *** pursuant to Article VI, Section 16 of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VI, sect. 16)," addressed the emergency COVID-19 situation as it related to court operations and issued an order allowing the chief judges of each circuit to continue trials for 60 days. Ill. S. Ct., M.R. 30370 (eff. Mar. 20, 2020). The order provided that "[i]n the case of criminal proceedings, any delay resulting from this emergency continuance order shall not be attributable to either the State or the defendant" for speedy-trial purposes. *Id.* On April 3, 2020, the supreme court amended its

order to allow for the continuance of trials until further order of the court. Ill. S. Ct., M.R. 30370 (eff. Apr. 3, 2020). On April 7, 2020, the court issued another amended order, which provided as follows:

> "The Chief Judges of each circuit may continue trials until further order of this Court. The continuances occasioned by this Order serve the ends of justice and outweigh the best interests of the public and defendants in a speedy trial. Therefore, such continuances shall be excluded from speedy trial computations contained in [the speedy-trial statute.] Statutory time restrictions in [the speedy-trial statute] *** shall be tolled until further order of this Court." Ill. S. Ct., M.R. 30370 (eff. Apr. 7, 2020).

¶ 36 On April 2, 2020, the Sixth Judicial Circuit issued Administrative Order 2020-03, which continued all jury trials "until no earlier than May 18, 2020." 6th Judicial Cir. Ct. Adm. Order 2020-03 (Apr. 2, 2020). On April 30, 2020, the Sixth Judicial Circuit issued Administrative Order 2020-06, which continued all jury trials "to no earlier than June 15, 2020." 6th Judicial Cir. Ct. Adm. Order 2020-06 (Apr. 30, 2020).

¶ 37 As discussed above, defendant argues the supreme court orders tolling the speedy-trial time period "violate Article II, Section 1, of the Illinois Constitution and the well-established principle of the separation of powers." Defendant maintains that because the supreme court lacked the authority to toll the speedy-trial time period, the speedy-trial period was not tolled from April 20, 2020, to June 5, 2020, meaning an additional 46 days had elapsed prior to trial, for a total of 145 days. Thus, according to defendant, because he was not tried within 120 days of being placed in custody, we must vacate his conviction.

¶ 38    The doctrine of separation of powers is found in section 1 of article II of the Illinois Constitution of 1970, which states, "[t]he legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1. "The judicial power is vested in a Supreme Court, an Appellate Court and Circuit Courts." Ill. Const. 1970, art. VI, § 1. "General administrative and supervisory authority over all courts is vested in the Supreme Court and shall be exercised by the Chief Justice in accordance with its rules." Ill. Const. 1970, art. VI, § 16. "The judicial power has been described as including the adjudication and application of law and the procedural administration of the courts." *Kunkel v. Walton*, 179 Ill. 2d 519, 528 (1997).

¶ 39    In *Kunkel*, our supreme court elaborated on the bounds of the doctrine of the separation of powers:

"The separation of powers provision does not seek to achieve a complete divorce between the branches of government; the purpose of the provision is to prevent the whole power of two or more branches from residing in the same hands. [Citation.] There are areas in which separate spheres of governmental authority overlap and certain functions are thereby shared. [Citation.] Where matters of judicial procedure are at issue, the constitutional authority to promulgate procedural rules can be concurrent between the court and the legislature. The legislature may enact laws that complement the authority of the judiciary or that have only a peripheral effect on court administration. [Citation.] Ultimately, however, this court retains primary constitutional authority over court procedure. Consequently, the separation of powers principle is violated when a legislative enactment unduly encroaches upon the inherent powers of the

judiciary, or directly and irreconcilably conflicts with a rule of this court on a matter within the court's authority. [Citations.] With regard to separation of powers violations resulting from conflicts between statutory provisions and court rules, this court has indicated that even where a statute, standing alone, does not violate the separation of powers clause, the legislature is without authority to interfere with a product of this court's supervisory and administrative responsibility. [Citation.] The principle that court rules will supersede inconsistent statutory provisions is connected to the undisputed duty of the court to protect its judicial powers from encroachment by legislative enactments, and thus preserve an independent judicial department." (Internal quotation marks omitted.) *Id.* at 528-29.

¶ 40    In *People v. Mayfield*, 2021 IL App (2d) 200603, the Second District recently relied on *Kunkel* in holding the supreme court's COVID-19 orders did not violate the doctrine of separation of powers:

"The scheduling of criminal trials is a matter of procedure within the realm of our supreme court's primary constitutional authority. Pursuant to *Kunkel*, the court's exercise of that authority through its orders prevails over the [speedy-trial statute]. Thus, the supreme court had the authority to allow the tolling of the time limits under the Act for bringing criminal defendants to trial. The court exercised that authority *** in response to a pandemic that threatened the health and safety of millions of Illinois residents." *Id.* ¶ 21.

¶ 41    We find the reasoning in *Mayfield* instructive and agree with its holding. To find otherwise would be to restrict the judiciary from exercising its primary authority over "the

- 14 -

procedural administration of the courts." *Kunkel*, 179 Ill. 2d at 528. Such a result would be a clear violation of separation-of-powers principles. See *id.* at 529 (explaining that "the legislature is without authority to interfere with a product of [the supreme] court's *** administrative responsibility" (internal quotation marks omitted)). As the *Mayfield* court noted, the supreme court was forced to respond to the "exceptional and urgent circumstances" of the "deadly pandemic." *Mayfield*, 2021 IL App (2d) 200603, ¶ 24. To the extent the court's response conflicted with the speedy-trial statute, the court's orders must prevail in light of its basic authority over the procedural administration of the courts. See *Kunkel*, 179 Ill. 2d at 529 ("The principle that court rules will supersede inconsistent statutory provisions is connected to the undisputed duty of the court to protect its judicial powers from encroachment by legislative enactments ***." (Internal quotation marks omitted)). Accordingly, we reject defendant's argument.

¶ 42                                        B. Restraints at Trial

¶ 43          Defendant next argues his due process rights were violated when the trial court allowed him to be placed in restraints at trial without first conducting a hearing and finding a manifest need for the restraints, as required by Illinois Supreme Court Rule 430 (eff. July 1, 2010). Defendant concedes he initially waived this argument by agreeing to be shackled at trial so long as the prosecutor remained at or near his own table. However, he contends he "rescinded that waiver when he objected to the court's decision to allow the prosecutor to use the podium," thereby triggering the court's duty to comply with Rule 430. The State maintains defendant's objections "can not be seen as a complete withdraw[al] of his prior agreement to be shackled, such that the court was then required to conduct a Rule 430 hearing." Alternatively, the State argues that even if the court erred, the error was harmless beyond a reasonable doubt.

¶ 44       Illinois Supreme Court Rule 430 (eff. July 1, 2010) provides as follows:

> "An accused shall not be placed in restraint of any form unless there is a
> manifest need for restraint to protect the security of the court, the proceedings, or
> to prevent escape. Persons charged with a criminal offense are presumed innocent
> until otherwise proven guilty and are entitled to participate in their defense as free
> persons before the jury or bench. Any deviation from this right shall be based on
> evidence specifically considered by the trial court on a case-by-case basis. ***
> Once the trial judge becomes aware of restraints, prior to allowing the defendant
> to appear before the jury, he or she shall conduct a separate hearing on the record
> to investigate the need for such restraints."

The rule goes on to state that after the court allows the defendant to be heard and makes specific findings with respect to ten enumerated factors, "the trial judge shall balance these findings and impose the use of a restraint only where the need for restraint outweighs the defendant's right to be free from restraint." *Id.* "The decision on whether and how to restrain a defendant is left to the trial court's discretion." *People v. Reese*, 2017 IL 120011, ¶ 47. The trial court's failure to follow the procedure outlined in Rule 430 results in a violation of the defendant's due process rights. *Id.* ¶ 49.

¶ 45       Here, the trial court did not conduct the hearing contemplated by Rule 430 before allowing defendant to appear shackled before the jury, but the parties agree defendant waived any argument this constituted error when defendant initially agreed to be shackled at trial so long as the prosecutor remained at or near his table. However, defendant argues he "rescinded that waiver when he objected to the court's decision to allow the prosecutor to use the podium." Defendant further contends that, in addition to rescinding his initial waiver, he also properly

preserved this issue for review "by making a contemporaneous objection to being shackled." We agree with the State that defendant has not established his comments to the court reflect a rescission of his initial waiver of the Rule 430 requirements. Further, we find that, even assuming defendant rescinded his waiver of this argument, any alleged error in failing to comply with the requirements of Rule 430 was harmless beyond a reasonable doubt.

¶ 46 The record in this case shows that after the prosecutor requested to use the podium when questioning L.B., the court asked defendant if he had any objection to this request. Defendant said he did and proceeded to provide four separate bases for his objection, none of which had anything to do with being shackled or a lack of compliance with Rule 430. First, defendant objected on the basis the prosecutor would be able to "have eye contact and be able to communicate with [the witnesses] without me even *** having knowledge of it." Second, defendant explained, "He get[s] a chance to speak to them outside of me being present. When he go[es] to the hallway to talk to the witnesses, he might be able to say a few things to them to make them blend into what it is that he ha[s] to say, a coaching somehow." Third, he said, "the purpose for the agreement from the beginning [was] to not be able to use the podium." Finally, when the court asked if defendant had a final objection for the record, defendant responded, "It's basically *** an influence, basically, so." We decline to say any of these objections amounted to a rescission of his waiver. Despite the court informing the parties of the requirements of Rule 430 prior to ruling defendant would be placed in restraints, defendant never even mentioned that rule or said anything about being shackled when he provided his reasons for objecting. Even construing the four bases for the objection discussed above in favor of defendant, we cannot say that they—either taken individually or in conjunction—fairly informed the court that defendant was objecting on the basis that he did not agree to be shackled at trial unless the court first

- 17 -

conducted a hearing pursuant to Rule 430 and found a manifest need for the use of restraints. Accordingly, we find defendant waived this argument.

¶ 47 Moreover, even assuming defendant properly rescinded his waiver and the court erred in failing to comply with the requirements of Rule 430, we nonetheless would find any error was harmless beyond a reasonable doubt. The appellate court has explained harmless-error analysis as follows:

> "Three approaches have been used for determining whether an error is harmless beyond a reasonable doubt: (1) focusing on the error to determine whether it may have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) considering whether the evidence is cumulative or duplicates properly admitted evidence." *People v. Bass*, 2019 IL App (1st) 160640, ¶ 81.

¶ 48 Here, the third approach is inapplicable because the alleged error does not involve the admission of inadmissible evidence. However, the first and second approaches favor a finding of harmless error. By focusing on the alleged error, we cannot conceive of how defendant's shackles may have contributed to the conviction. While the prosecutor noted that the alternate jurors, who were excused prior to deliberations, "may well see" defendant's shackles, defendant fails to point to anything in the record that would suggest the remaining jurors had any knowledge he was restrained at trial.

¶ 49 Additionally, the evidence of defendant's guilt was overwhelming. L.B. testified the event in question occurred "in the early summer of 2018" when she was home alone with defendant. L.B. further testified her mother was not home because she was at the food pantry. This testimony was corroborated by L.B.'s mother, who said she came home one day in "late

June or early July" and found L.B. alone with defendant. L.B.'s testimony was further corroborated by Robin Mathis. Mathis testified she runs a food pantry in Champaign and her records indicated L.B.'s mother visited the food pantry on June 20, 2018. Moreover, although defendant told Detective Petrilli he was not in Champaign at the relevant time, defendant was subject to GPS monitoring at the time, and the GPS records indicated he was near L.B.'s home for the majority of the day on June 20, 2018. Finally, the State also introduced the testimony of R.C. to demonstrate defendant's propensity to commit sexual offenses against minors. Based on this evidence, we conclude any alleged error was harmless beyond a reasonable doubt.

¶ 50                                C. Excessive Sentence

¶ 51          Defendant's final argument is that the trial court imposed an excessive sentence. Specifically, defendant, who was 43 years old at the time of sentencing, asserts the court erred in sentencing him to 40 years' imprisonment "without first finding that [he] is beyond rehabilitation before imposing the practical equivalent of a term of natural life." Defendant acknowledges he did not preserve this issue for review because he failed to object at the sentencing hearing and file a motion to reconsider sentence. See, *e.g.*, *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Nonetheless, he maintains we may address it under the first prong of the plain-error doctrine.

¶ 52          The plain-error doctrine is a "narrow and limited exception" to the general rules of forfeiture. *Id.* at 545. To obtain relief under the doctrine, a defendant "must first show that a clear or obvious error occurred." *Id.* As argued in this case, if the defendant makes the requisite showing of clear or obvious error, he must then demonstrate "the evidence at the sentencing

hearing was closely balanced." *Id.* The defendant bears the burden of persuasion under the plain-error doctrine, and failure to satisfy that burden results in the forfeiture being honored. *Id.*

¶ 53 "The Illinois Constitution requires that 'all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *People v. Cook*, 2021 IL App (3d) 190243, ¶ 38 (quoting Ill. Const. 1970, art. I, § 11). In fashioning an appropriate sentence, the trial court must consider "all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of [the] defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). "As long as the court does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors, it has wide latitude in sentencing a defendant to any term within the statutory range prescribed for the offense." *People v. Hernandez*, 204 Ill. App. 3d 732, 740 (1990). "The balance which is to be struck amongst the aggravating and mitigating factors is a matter of judicial discretion which should not be disturbed on review absent an abuse of that discretion." *Id.*; see also *People v. Alexander*, 239 Ill. 2d 205, 212 (2010) ("A reviewing court may not alter a defendant's sentence absent an abuse of discretion by the trial court."). "A sentence will be deemed an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Id.*

¶ 54 Here, defendant was convicted of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1), (b)(1) (West 2016)), a Class X felony with a sentencing range of 6 to 60

years' imprisonment. The trial court sentenced defendant to 40 years' imprisonment, which falls within the range prescribed by the legislature.

¶ 55    We find defendant has failed to establish that the trial court clearly abused its discretion in sentencing him to 40 years' imprisonment. Defendant's argument is premised on the following proposition: "[O]nce the court decided to impose a lengthy sentence, the question before it was no longer what sentence was appropriate within [the applicable sentencing] range. The question was whether [defendant] should receive a sentence he would be reasonably likely to survive, or should die in prison." Thus, according to defendant, the court abused its discretion in imposing "a sentence that will keep him in prison until age 76" without first making an express finding that he "was beyond rehabilitation." See *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26 ("[A] person held in a general prison population has a life expectancy of about 64 years."). Defendant's argument is unpersuasive. He has failed to cite to any authority in support of the legal proposition he advances. This is likely due to the fact that, as noted by the State and not refuted by defendant in his reply brief, "there is no Illinois rule, statute or precedent which requires a sentencing court to determine whether a defendant might [outlive] his sentence." Because there is no rule requiring sentencing courts to make an express finding that a defendant is "beyond rehabilitation" before imposing a sentence that would keep them imprisoned beyond the age of 64, we reject defendant's argument.

¶ 56    Moreover, a review of the record shows the trial court properly balanced the applicable aggravating and mitigating factors. In aggravation, the court found the following factors applied: (1) defendant's conduct caused serious harm to L.B., as demonstrated by her trial testimony and victim-impact statement; (2) defendant had an extensive criminal history; (3) there was a need to deter others in the community from committing sexual offenses against minors;

(4) defendant was on probation or parole when he committed the instant offense; and

(5) defendant "held a position of trust or supervision" with respect to L.B. In mitigation, the court found only that defendant was unlikely to commit a similar offense "if he is incarcerated for a long period of time and also likely because he will be required to register as a sex offender for most, if not all, of his natural life after he serves whatever sentence is imposed." However, merely because the court determined defendant was unlikely to commit a similar offense in the future, it does not follow that the court had to give this factor greater weight than the numerous aggravating factors that applied. See, *e.g.*, *People v. Coleman*, 166 Ill. 2d 247, 261 (1995) ("A defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense."). To the contrary, this court has consistently held, as was noted by the trial court at sentencing, that the seriousness of the offense is the most important factor to consider. See, *e.g.*, *People v. Busse*, 2016 IL App (1st) 142941, ¶ 28 ("In fashioning the appropriate sentence, the most important factor to consider is the seriousness of the crime."). Accordingly, we conclude defendant has failed to establish that the trial court clearly abused its discretion, and we honor his forfeiture of this argument.

¶ 57                                    III. CONCLUSION

¶ 58          For the reasons stated, we affirm the trial court's judgment.

¶ 59          Affirmed.